460 F.2d 1
 80 L.R.R.M. (BNA) 2417, 80 L.R.R.M. (BNA) 2841,
68 Lab.Cas. P 12,697
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL 810, STEEL, METALS, ALLOYS & HARDWARE FABRICATORS &
WAREHOUSEMEN, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent,
and Sid Harvey, Inc. and Sid Harvey Brooklyn Corp., Intervenors.
 Nos. 574, 575, Dockets 71-1951, 71-2062.
 United States Court of Appeals,
Second Circuit.
 Argued March 24, 1972.
Decided May 11, 1972.
 
 Jack H. Weiner, Washington, D. C. (Peter G. Nash, Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Nancy M. Sherman, Washington, D. C., on the brief), for petitioner.
 Thomas Canafax, Jr., Washington, D. C. (Shimmel, Hill & Bishop, Washington, D. C., and Henry Brickman, New York City, on the brief), for respondent.
 John T. Redmond, New York City (James H. Tully, Jr., Wood, Redmond & Tully, New York City, on the brief), for intervenors.
 Before HAYS, MANSFIELD and MULLIGAN, Circuit Judges.
 HAYS, Circuit Judge:
 
 
 1
 The National Labor Relations Board filed this application for enforcement of its order directing respondent Local 810 to cease and desist from conducting a secondary boycott in violation of Section 8(b) (4) (i) and (ii) (B) of the National Labor Relations Act, 29 U.S.C. Sec. 158(b) (4) (i) and (ii) (B) (1970). The charging parties, Sid Harvey, Inc. and Sid Harvey Brooklyn Corp., intervened, urging that the application be granted. The Union cross-petitioned to set aside the Board's order. We deny enforcement of the Board's order and grant respondent's cross-petition to set it aside.
 
 I. The Facts
 
 2
 The Trial Examiner's findings of fact were adopted by the Board and are supported by substantial evidence. These findings establish the following:
 
 A. The Initial Dispute
 
 3
 An employee of Sid Harvey Supply, Inc. was discharged on February 20, 1970, and the Union went on strike after the company refused to reinstate him. The Union began picketing Supply that day, and on March 10 commenced picketing Sid Harvey, Inc. In May and June, members of the Union picketed and distributed handbills in front of stores operated by Sid Harvey Brooklyn Corp., Sid Harvey Nassau, Inc., and Sid Harvey Suffolk, Inc. The picket signs and leaflets, and the verbal exhortations of the pickets, requested the public not to buy Sid Harvey products. The pickets were successful in persuading some of the potential customers of one store operated by Nassau not to patronize that store, and also prevailed on carriers not to make deliveries to Inc. and Brooklyn. On June 11 the Union discontinued the picketing of Inc., Brooklyn, Nassau, and Suffolk after the United States District Court for the Eastern District of New York temporarily enjoined the Union from picketing the four corporations in violation of Sec. 8(b) (4) (i) and (ii) (B).
 
 
 4
 B. Relationships Among the Sid Harvey Companies
 
 1. Structure and Operations
 
 5
 Supply, the company which the Union struck, and the four companies the Union picketed before the issuance of the temporary injunction, are a part of a complex of interrelated corporations operating on a nationwide basis. The Sid Harvey corporations are engaged in the reconditioning, distribution, and sale of air conditioning and heating equipment to trade users. While the Sid Harvey corporations are not totally interdependent, they constitute what is essentially a vertically integrated operation, or to use the popular term for their relationship to each other, they are engaged in a straight-line operation.
 
 
 6
 The keystone of the Sid Harvey organization is Inc., located in Valley Stream, Long Island. Inc., and Sid Harvey Midwest, Inc., located in Illinois, are engaged in the business of rebuilding and reconditioning air conditioning and heating equipment and parts for such equipment. Inc. obtains the used equipment that it rebuilds from the sales companies within the Sid Harvey group.
 
 
 7
 The equipment rebuilt by Inc. is warehoused and then distributed by Supply to the various Sid Harvey sales companies. Supply does not distribute only Inc. goods, but all of Inc.'s goods are distributed by Supply. Supply distributes only to sales companies within the Sid Harvey group.
 
 
 8
 Although the record is not entirely clear, it appears that there are approximately 20 sales companies in the Sid Harvey group, many of which, like Nassau, Brooklyn, and Suffolk, have corporate names containing the words "Sid Harvey." These sales companies receive from Inc. via Supply all the rebuilt equipment they sell. The greater part of the new equipment sold by the sales companies is obtained indirectly from the manufacturers through Supply, with the remaining portion obtained directly from manufacturers. Thus, of Nassau's sales, 40% represents sales of Inc.'s rebuilt equipment, and 60% is of new equipment; 60% of the new equipment sold is obtained through Supply. The corresponding figures for Brooklyn are 20%, 80%, and 85-90%, and for Suffolk are 33%, 67%, and 70%.
 
 2. Control
 
 9
 Stephen Harvey owns 100% of the voting stock of Inc., and is chairman of the board of directors, president, and treasurer. Supply is owned by fourteen Sid Harvey sales companies located in the Northeast. Stephen Harvey has voting control of nine of these sales companies, including Brooklyn and Nassau. Collectively those nine own 73% of the stock of Supply. Stephen Harvey is chairman of the board and an officer of each of these sales companies, and is chairman of the board and treasurer of Supply. Although Stephen Harvey has a commanding position in the interlocking corporate structure of the Sid Harvey group, the Trial Examiner found that he "has no actual day-to-day duties in any of these corporations except Inc."
 
 
 10
 3. Corporate Policy and Functional Relationships
 
 
 11
 Much of the hearing and a large part of the opinion of the Trial Examiner were devoted to an examination of policies, practices, and working conditions within the various Sid Harvey corporations. In view of the basic questions raised by a suit of this nature, a good deal of what the Trial Examiner concerned himself with was of marginal relevance and dubious materiality.
 
 
 12
 The Trial Examiner found that some of Inc.'s marketing activities are conducted in the building where Supply has its offices, although the areas in which the two corporations are located "are separated by partitions and lockable doors (which are open during working hours), and the employees of each company have separate entrances and separate restrooms." The two pay rent directly to the landlord, a partnership in which Stephen Harvey "has an interest," as he does in all the partnerships from which companies in the Sid Harvey group rent land and facilities. The two corporations located in the one building utilize a common switchboard, and Inc. pays Supply a service fee for "some minor services" such as janitorial work. All the companies in the Sid Harvey group have the same hospital, medical, group life, and automobile liability policies. Occasionally an employee of one of the companies will take a job with another Sid Harvey company. One accounting firm served all the Sid Harvey corporations and it "prepared an office manual of standard operating procedures." However the companies were not required to use the manual.
 
 
 13
 The Trial Examiner compared the working conditions at Supply and Inc. and found:
 
 
 14
 "Although [the Union] showed a number of working conditions in common among the employees of Inc. and Supply, [including "the same system of rating jobs, the same work hours and two 10-minute rest periods, the same number of holidays, Christmas bonuses based upon length of service, the same profit-sharing program"] there were also many working conditions that were different between the two groups . . . . The two groups had different rules for qualification of overtime, different sick pay and disability benefits, and other benefits. Supply has no pension plan; Inc. does. Inc. has a cash attendance award. Supply does not. Inc. has a savings plan for employees; Supply does not. There are differences in the rules on 'tardiness,' smoking, making telephone calls, working on Election Day, to mention a few."
 
 
 15
 More important for the question presented by this case, the Trial Examiner and the Board found that once a year "the presidents and some other top executives" of the Sid Harvey group of companies meet to discuss problems common to the companies. The Board found that at the May, 1970 meeting the strike at Supply was discussed, but "there was no proof that overall policies resulted from these meetings, particularly no overall labor policy or personnel policy."
 
 
 16
 In addition the Board found that Stephen Harvey had personally fired two presidents of two Sid Harvey companies, and that he actively oversaw and controlled the financial aspects of the Sid Harvey companies. Inc. publishes a monthly news letter, "Renews," which the Trial Examiner termed a "house organ." This house organ contains news about people in the various Sid Harvey companies as well as corporate news. Its content reveals that the personnel of the companies considered themselves to be engaged in interlocking business activities in an interrelated corporate structure.
 
 II. The Decision of the Board
 
 17
 The Board, adopting the Trial Examiner's decision, stated that the question of whether the Union had violated Sec. 8(b) (4) (i) and (ii) (B) by picketing Brooklyn, Suffolk, Nassau, and Inc. turned on whether the related companies were so closely allied as not to be "other employer[s]" within the meaning of that section. The Board said:
 
 
 18
 "On the 'ally' issue the precise question is whether the corporations were under the actual control of Stephen Harvey, as distinguished from his potential control."
 
 The Board found
 
 19
 "[u]pon all the above facts and considerations and the entire record in the case considered as a whole . . . that despite the cooperation and mutual assistance among the various corporations directly involved herein, there is not that appreciable degree of integration of management and day-to-day operations between Supply, the primary employer, and the others, as to make them allies and deprive Inc., Brooklyn, Nassau, and Suffolk of the protection of Section 8(b) (4) of the Act." (Emphasis added.)
 
 
 20
 In so holding, the Board relied heavily on the conclusion, that, despite Stephen Harvey's dominant position in the corporate structures of Inc., Supply, and the various Sid Harvey sales companies, he did not actually control the daily operations of all these companies. In addition, in considering the differences in the working conditions and benefits of Supply, Inc., and the sales companies, the Board assumed that if the management and operations of the Sid Harvey group were integrated on a day to day basis, all working conditions and benefits-such as smoking rules and disability benefits-would be the same, regardless of the function or size of the individual company.III. Section 8(b) (4) and the Neutral Secondary Employer
 
 
 21
 The question presented for decision by the Board was whether the four secondary employers picketed by the Union were in fact the same employer within the meaning of Sec. 8(b) (4) (i) and (ii) (B), which provides:
 
 
 22
 "(b) It shall be an unfair labor practice for a labor organization or its agents-
 
 
 23
 ******
 
 
 24
 * * *
 
 
 25
 (4) (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in any industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is-
 
 
 26
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees . . . Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . ."
 
 
 27
 The question presented in this case is whether the Board applied the correct legal test and whether it could properly conclude, on the basis of the evidence in the record that the four employers picketed by the Union were "other employer[s]" within the meaning of the Act.
 
 
 28
 Section 8(b) (4), as amended, was enacted to prevent the widening of a labor dispute to entangle employers who had no concern with the original dispute. To this end Congress prohibited unions from engaging in secondary boycotts, that is "pressure tactically directed toward a neutral employer in a labor dispute not his own." National Woodwork Mfrs. Ass'n v. N. L. R. B., 386 U.S. 612, 623, 87 S.Ct. 1250, 1257, 18 L.Ed.2d 357 (1967) (footnote omitted). The broad policy objective of this section is "the protection of neutrals against secondary pressure . . . ." Id. at 627, 87 S.Ct. at 1259 (emphasis added) "Congressional concern over the involvement of third parties in labor disputes not their own prompted Sec. 8(b) (4) (B). This concern was focused on the 'secondary boycott,' which was conceived of as pressure brought to bear, not 'upon the employer who alone is a party [to a dispute], but upon some third party who has no concern in it"' (footnotes omitted). N. L. R. B. v. Local 825, Int'l Union of Operating Engineers, 400 U.S. 297, 302-303, 91 S.Ct. 402, 406, 27 L.Ed.2d 398 (1971). The basic question in this case is whether in fact Inc., Nassau, Brooklyn, and Suffolk were neutral third parties in the dispute between respondent Union and Supply. N. L. R. B. v. Local 810, Steel Fabricators, 299 F.2d 636, 637 (2d Cir. 1962); N. L. R. B. v. Milk Drivers Local 584, 341 F.2d 29, 32-33 (2d Cir.), cert. denied, 382 U.S. 816, 86 S.Ct. 39, 15 L.Ed. 2d 64 (1965).
 
 
 29
 In determining whether an employer is in fact a neutral in a labor dispute, the courts have considered such factors as the extent to which a corporation is de facto under the control of another corporation, the extent of common ownership of the two employers, the integration of the business operations of the employers, and the dependence of one employer on the other employer for a substantial portion of its business. See, e. g., Carpet Layers Local 419 v. N. L. R. B., 429 F.2d 747, 752 (D.C. Cir. 1970); N. L. R. B. v. General Teamsters Local 126, 435 F.2d 288, 291 (7th Cir. 1970); Truck Drivers Local 728 v. Empire State Express, Inc., 293 F.2d 414, 423 (5th Cir.), cert. denied, 368 U.S. 931, 82 S.Ct. 365, 7 L.Ed.2d 194 (1961); N. L. R. B. v. Somerset Classics, Inc., 193 F.2d 613, 615 (2d Cir.), cert. denied, 344 U.S. 816, 73 S.Ct. 10, 97 L.Ed. 635 (1952).
 
 
 30
 As the court said in Vulcan Materials Co. v. United Steelworkers of America, 430 F.2d 446, 451, 453 (5th Cir. 1970), cert. denied, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971):
 
 
 31
 "In the final analysis, however, the question of neutrality cannot be answered by the application of a set of verbal formulae. Rather, the issue can be resolved only by considering on a case-by-case basis the factual relationship which the secondary employer bears to the primary employer up against the intent of the Congress as expressed in the Act to protect employers who are 'wholly unconcerned' and not involved in the labor dispute between the primary employer and the union.
 
 
 32
 ******
 
 
 33
 * * *
 
 
 34
 In determining whether the relationship of a secondary employer and a primary employer is such as to destroy neutrality, the court must look to the essence of the relationship, and not to its incidental trappings."
 
 
 35
 See also Local 24, Int'l Bhd. of Teamsters v. N. L. R. B., 266 F.2d 675, 680 (D.C. Cir. 1959). The Supreme Court has cautioned against the mechanical application of tests which obscures the "central theme"-neutrality-of this section. Nat'l Woodwork Mfrs. Ass'n v. N. L. R. B., supra, at 625, 87 S.Ct. 1250. See also Local 761, Intern Union of Electrical, etc., Workers. v. N. L. R. B., 366 U.S. 667, 677, 81 S.Ct. 1285, 6 L. Ed.2d 592 (1961). Cf. N. L. R. B. v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).
 
 
 36
 Neutrality, for purposes of the Act, is not a technical concept. To determine whether an employer is neutral involves a common sense evaluation of the relationship between the two employers who are being picketed. In mechanically applying a "day-to-day" test in this case, the Board engaged in a technical exercise in the intricacies of corporate structure rather than a realistic, common sense evaluation of neutrality.
 
 
 37
 The Sid Harvey organization is essentially an integrated complex which manufactures, distributes, and sells a limited number of products. Ownership and control of the five corporations is centralized or overlapping. The daily contact among the corporations is extensive, and the operation and success of each is interrelated with and heavily dependent upon the other members of the group performing their assigned tasks. Only in the most strained and technical sense could the picketed employers be characterized as neutral.
 
 
 38
 The petition for enforcement is denied, and the cross petition for an order vacating the order of the Board is granted.
 
 MANSFIELD, Circuit Judge (concurring):
 
 39
 While I agree with the majority's view, as expressed in Judge Hays' able opinion, that as a matter of law the union did not violate the secondary boycott provisions of the National Labor Relations Act, Sec. 8(b) (4) (i), (ii) (B), I feel that a more detailed explanation of my reasons is required.
 
 
 40
 Ever since the addition of the secondary boycott provisions to the NLRA, the separation of primary and thus protected concerted activity from secondary and hence unprotected concerted activity has led to great difficulty, in part because of the absence of legislative guidelines. As Justice Harlan, speaking for the Supreme Court, recently noted:
 
 
 41
 "No cosmic principles announce the existence of secondary conduct, condemn it as an evil, or delimit its boundaries. These tasks were first undertaken by judges, intermixing metaphysics with their notions of social and economic policy. And the common law of labor relations has created no concept more elusive than that of 'secondary' conduct; it has drawn no lines more arbitrary, tenuous, and shifting than those separating 'primary' from 'secondary' activities."
 
 
 42
 Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 386-387, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969). Nevertheless, boundary lines between "primary" and "secondary" activity have been drawn. It is clear, for example, that "allies" of a struck employer are not neutrals and are therefore not entitled to the protections of the secondary boycott provisions. An ally relationship may arise either from affirmative action-such as the performance of "struck work" by the secondary employer for the primary-or from the combination of circumstances. As the majority opinion notes, some of the circumstances which have been considered as persuasive in the past are the degree of common ownership of the employers involved, common control over their day-to-day operations and labor relations policies, and the extent of integration of business operations.
 
 
 43
 In my view the Board's error lay not merely in the mechanical application of the "day-to-day" test but also in its failure to give sufficient weight to other circumstances which are controlling in this case. The absence of one of the foregoing relevant circumstances (e. g., lack of exercise of "day-to-day" control) does not automatically entitle the "other" employer to gain a secondary or neutral status. Other circumstances may be sufficiently strong by themselves to call for denial of the claim of neutrality. Where there exists a high degree of common ownership and a large amount of economic interdependence between two or more companies, they should not be considered separate for the purpose of the secondary boycott provisions. In such instances the policies of the Act are best served by allowing the employees of one employer to extend their concerted activity to the situs of the other. "Any other rule would permit the employer to divide and conquer by doing business through several corporations, each comprising one bargaining unit." Levin, "Wholly Unconcerned": The Scope and Meaning of the Ally Doctrine Under Section 8(b) (4) of the NLRA, 119 U.Pa.L. Rev. 283, 320 (1970). On the other hand where there is common ownership only, such as exists in the typical conglomerate, without any substantial economic integration or interdependence, the pressure or absence of actual common control over operations or labor relations policies could be of great significance. See e. g., Los Angeles Newspaper Guild Local 69 v. NLRB, 443 F.2d 1173 (9th Cir. 1971), enforcing 185 N.L.R.B. No. 25 (1970); Miami Newspaper Pressmen's Local 46 v. NLRB, 322 F.2d 405, 409 (D. C.Cir. 1963); Employing Lithographers of Greater Miami v. NLRB, 301 F.2d 20, 29 (5th Cir. 1962); Television & Radio Artists v. NLRB, (D.C.Cir. April 17, 1972).
 
 
 44
 Applying the foregoing principles, I am convinced that Sid Harvey, Inc., Sid Harvey Brooklyn, Sid Harvey Suffolk, and Sid Harvey Nassau do not qualify for the statutory protection offered to "other employers." As the majority opinion indicates, by reason of Stephen Harvey's controlling stock interest, the degree of his domination and control of the several corporations, though only potential, was overwhelming. In addition, each company was fundamentally dependent on the others for its economic well-being. All of Inc.'s products are warehoused and distributed by Supply to the other Harvey companies. Although Supply purchases equipment from outside sources, it sells and distributes only to the Sid Harvey sales outlets. Furthermore, almost all of the products sold by Brooklyn, Nassau, and Suffolk are furnished by Supply. The picture, therefore, is of a manufacturing arm, a distribution arm, and several localized sales arms, each doing the bulk of its business with the others. In addition, there was evidence of an integrated advertising policy, a common telephone directory listing, periodic intercompany meetings, a common Sid Harvey newsletter, and other indicia of a coordinated enterprise. Under such circumstances I do not believe that the union was required to prove a greater degree of actual control by Stephen Harvey over the operations of the complex. In short, while neither the common ownership nor the extensive economic interdependence, standing alone, might be sufficient to establish an ally relationship, their combination in this case convinces me that the various Harvey corporations are not neutral or "wholly unconcerned".