543 F.2d 1373
 92 L.R.R.M. (BNA) 2987, 93 L.R.R.M. (BNA) 1373,
178 U.S.App.D.C. 60, 78 Lab.Cas. P 11,475,
79 Lab.Cas. P 11,584
 LOCAL UNION NO. 391, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
etc., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Chattanooga Division, Vulcan Materials Co., Intervenor.
 No. 74-1167.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 7, 1975.
Decided June 23, 1976.
Rehearing En Banc Denied Sept. 9, 1976.
 
 Hugh J. Beins, Washington, D. C., for petitioner.
 Peter M. Bernstein, Atty., N. L. R. B. of the bar of the Court of Appeals of New York, Washington, D. C., pro hac vice by special leave of court, with whom John S. Irving, Jr., Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and Robert A. Giannasi, Asst. Gen. Counsel, N. L. R. B., Washington, D. C., were on the brief for respondent.
 John J. Coleman, Jr., for intervenor.
 Before MacKINNON and ROBB, Circuit Judges, and CHRISTENSEN,* Senior District Judge for the District of Utah.
 PER CURIAM:
 
 
 1
 This case comes to us upon the petition of Local Union No. 391, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the Union) to review and set aside an order of the National Labor Relations Board. The Board has filed a cross application for enforcement of its order, which directed the Union to cease and desist from a secondary boycott. The Board's decision and order are reported at 208 NLRB No. 81 (1974).
 
 
 2
 The Board found that the Union picketed the premises of the Chattanooga Division, Vulcan Materials Company (Chattanooga) with whom the Union had no dispute, thereby coercing Chattanooga and inducing its employees to strike in furtherance of the Union's labor dispute with Mideast Division, Vulcan Materials Company (Mideast), in violation of section 8(b)(4)(i)(ii)(B) of the National Labor Relations Act as amended. 29 U.S.C. § 158(b)(4)(i)(ii)(B) (1970). This finding was predicated upon the Board's further finding that Chattanooga and Mideast are separate persons within the meaning of section 8(b) (4) of the Act. 29 U.S.C. § 158(b)(4). The question presented to us is whether substantial evidence on the record as a whole supports the Board's findings. We conclude that it does.
 
 
 3
 There is no substantial dispute about the facts, which were developed in a hearing before an administrative law judge. On the evidence presented to him he found that Vulcan Materials Company is a New Jersey corporation engaged in the manufacture and marketing of chemicals, metals and heavy construction materials. The company's headquarters and chief executive officers are located in Birmingham, Alabama. Vulcan conducts its operations through a chemical group, a materials group and five construction divisions within a construction materials group. The chemicals group is located in Wichita, Kansas and the materials group in Sandusky, Ohio. Mideast and Chattanooga are two of the construction divisions. Mideast, located in Winston-Salem, North Carolina, produces crushed stone and operates in North Carolina and Virginia. Chattanooga, based in the city of that name, produces crushed stone and ready-mixed concrete and serves the Chattanooga, Tennessee area. Neither division competes with the other, nor with any other division.
 
 
 4
 Vulcan is managed by a board of directors and an executive committee appointed by that board. Under them are two executive vice presidents, one for the chemicals and materials group, and one for the construction materials group. Each division is headed by a divisional president who is responsible to the executive vice president and the board of directors for the general management of the division, and for the control and profits of the division. In practice however Mideast and Chattanooga operate independently of each other and of Vulcan. Each divisional president has autonomy in the daily operations of his division. He has sole responsibility for the production and marketing of the division; he alone selects his staff, determines their pay, and hires and discharges personnel. There is no line of advancement for employees between the divisions, or between them and Vulcan. There is no interchange of employees between the divisions, nor is there any interchange of products. Interchange of equipment is negligible and on the same rental basis as when equipment is loaned to or exchanged with competitors. Each division maintains its own payroll, makes its own disbursements, does its own bookkeeping and accounting, and has its own bank account. Although the divisions submit financial reports to Vulcan these are generally informational in nature. A division can incur capital expenditures of up to $50,000 without Vulcan's prior approval. Each division president is responsible for determining the budget for his division.
 
 
 5
 The administrative law judge also found that there is no day-to-day communication in the usual sense between the divisions or between them and Vulcan. Each division president has broad authority to formulate his individual labor relations policies, to negotiate collective bargaining agreements and to execute these contracts. Although a divisional president may use the services of the industrial relations staff maintained by Vulcan in Birmingham, the use of such services is not obligatory but optional; a member of the staff participates in labor negotiations only at the invitation of a divisional president, who may accept or reject his recommendations. Similarly, pension plans, insurance plans and savings plans which are made available to the divisions by Vulcan may be accepted or rejected by the divisions.
 
 
 6
 Having won an election conducted by the Board the Union was certified as the collective bargaining representative of a unit of employees of Mideast's central services division. In preparation for the negotiations which were to follow, Louis Graham, president of Mideast, asked Vulcan's manager of industrial relations, Carl Whitten, to participate as a member of the Mideast negotiating team. Vulcan made Whitten available to counsel and guide Mideast, but Mideast was free to accept or reject his recommendations. The other members of the Mideast negotiating team were Jerry Simmons, Mideast manager of administration, and George Bell, manager of the central services storeroom. As manager of administration, Simmons was responsible for personnel safety and industrial relations. In the past he had engaged in negotiations with other labor organizations without the assistance of the home office. In preparation for the Mideast negotiations with the Union Simmons conducted a wage and economic survey to determine how Mideast compared with the industry.
 
 
 7
 Robert Majors, Vulcan's manager of manpower planning and development, visited Mideast facilities on three occasions during the negotiations and the subsequent strike. On one occasion, at the invitation of Mideast, he attended the final negotiation session as an unofficial observer. On the other two occasions, likewise by invitation, he assisted in preparing for the strike and devising training programs for supervisors. In 1970 he had assisted the president of Chattanooga in negotiating a contract with Teamsters Local 515. His assistance was invited by Chattanooga's president who directed and controlled the negotiations.
 
 
 8
 President Graham formulated the Mideast contract proposals and authorized Whitten to act as chief spokesman for Mideast in the negotiations. In the negotiations Whitten informed the Union representatives that although he was from the home office he was present at the invitation of the division and his role would simply be to help the division express its views. He said that Vulcan was decentralized, that each division was responsible for the profits of the business and for its management. Acting as chief spokesman for Mideast in the negotiations, pursuant to specific authority from President Graham, Whitten made tentative agreements with the Union. Graham however reviewed the division's proposals before every negotiating session, rejected some specific recommendations suggested by Whitten, and made the final decisions on all Mideast contract proposals.
 
 
 9
 After several fruitless discussions Mideast and the Union reached an impasse in their negotiations. Thereafter the Union struck Mideast and commenced picketing the central services division in Winston-Salem. Some two weeks later the Union picketed the Chattanooga ready-mix plant and quarry. At both Winston-Salem and Chattanooga the pickets carried signs bearing the legend "Vulcan Materials Plant on Strike Teamsters Local 391". The Union did not represent any of Chattanooga's employees and had no labor dispute with Chattanooga. In fact Chattanooga's employees were represented by other unions, including a sister local of Local 391, and there were no labor disputes between Chattanooga and these unions. At the time of the picketing as well as prior thereto, there was no interchange of products or employees between Mideast and Chattanooga, and Chattanooga had not performed any work for Mideast.
 
 
 10
 The picketing at Chattanooga caused Chattanooga's employees to cease work, completely shutting down operations at Chattanooga. As a result the Board issued its complaint alleging the picketing violated section 8(b)(4)(i)(ii)(B) of the Act. 29 U.S.C. § 158(b)(4)(i)(ii)(B) (1970). After the issuance of the complaint the regional director of Region 10 of the Board petitioned the United States District Court for the Eastern District of Tennessee for an order pursuant to section 10(i) of the Act, temporarily enjoining the picketing at Chattanooga. In an opinion rejecting union contentions which were essentially the same as those presented to us, the court granted the relief prayed for by the regional director. Phillips v. Local 39, Teamsters, 82 LRRM 2195 (1973).
 
 
 11
 There can be no question that in furtherance of its dispute with Mideast the Union picketed Chattanooga, whose employees were members of other unions and had no dispute with Chattanooga. As a result, the Chattanooga employees ceased work and normal operations were closed down. Moreover there is no question that by its picketing the Union induced and encouraged employees of Chattanooga to strike and withhold their services and that the Union thereby restrained and coerced Chattanooga with an object of forcing it to cease doing business with its customers and suppliers. Thus, the issue is whether the Board properly found that Chattanooga is entitled to the protection of the secondary boycott provisions of section 8(b)(4) of the Act. 29 U.S.C. § 158(b)(4). That section provides, in relevant part, that it shall be an unfair labor practice for a union or its agents:
 
 
 12
 (i) to engage in, or to induce or encourage any individual employed by any person * * * to engage in, a strike or a refusal in the course of his employment to * * * perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is
 
 
 13
 (B) forcing or requiring any person * * * to cease doing business with any other person . . . . (Emphasis added.)
 
 
 14
 Further refined, the issue is whether the record supports the finding and conclusion of the Board that Chattanooga is an entity sufficiently separate and distinct to be treated as a "person" in applying the secondary boycott provisions of subsection (B).
 
 
 15
 We think the record supports the Board's conclusions. Although the ultimate power to control both Mideast and Chattanooga resides in Vulcan, in fact that power has not been exercised; on the contrary each division exercises final and independent control over its operations, including its labor relations. The services of Whitten and Majors were advisory only and were furnished only at the invitation of the presidents of Mideast and Chattanooga, who made all final decisions. In short, the evidence justifies the finding that the divisions are operated as autonomous enterprises, under the doctrine of American Fed. of Television and Radio Artists v. N.L.R.B., 149 U.S.App.D.C. 272, 462 F.2d 887 (1972), and Los Angeles Newspaper Guild, Local 69 v. N.L.R.B., 443 F.2d 1173 (9th Cir. 1971), enfg. 185 NLRB No. 25 (1970), cert. denied, 404 U.S. 1018, 92 S.Ct. 681, 30 L.Ed.2d 666 (1972).
 
 
 16
 We believe it is prudent to emphasize that the evidence here is that the independence of the Vulcan divisions is genuine, and not a mere facade designed for tactical or strategic purposes. A specious intra-corporate arrangement, contrived to take advantage of the protection of the secondary boycott provisions of the Act, obviously would stand on a different footing.
 
 
 17
 The Board's order will be enforced.
 
 
 18
 So Ordered.
 
 
 19
 Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.
 
 ORDER
 
 20
 PER CURIAM.
 
 
 21
 The suggestion of petitioner for rehearing en banc having been transmitted to the full Court and no Judge having requested a vote thereon, it isORDERED by the Court en banc that petitioner's aforesaid suggestion for
 
 
 22
 rehearing en banc is denied. STATEMENT OF CHIEF JUDGE
 
 
 23
 BAZELON, IN WHICH JUDGE WRIGHT JOINS, AS TO WHY HE
 
 
 24
 VOTED TO DENY REHEARING EN BANC.
 
 
 25
 Although, for the reasons outlined below, I am troubled by the Board's opinion in this case and by the panel's affirmance of it, I vote to deny a rehearing en banc. I do so largely because I am hopeful that the Supreme Court's consideration of Enterprise Assn. v. NLRB, 172 U.S.App.D.C. 225, 521 F.2d 885 (1975) (en banc ) (hereinafter Enterprise Ass'n), cert. granted, 424 U.S. 908, 96 S.Ct. 1101, 47 L.Ed.2d 311, will provide some guidance on the issues that I find troubling. Moreover, I am not convinced that this case rises to the level of "exceptional importance" required by Fed.R.App.Pro. Rule 35, both because no practical consequences would flow from a reversal of the Board's decision, and because the panel's opinion here is a relatively narrow one, closely tied to the facts of this particular case.[1]
 
 
 26
 While this case is therefore not an appropriate one for consideration by the full court, I do wish to highlight some of the problems raised by the Board's decision. In National Woodwork Manufacturers Ass'n. v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967) (hereinafter National Woodwork ) the Supreme Court held that, in order to distinguish protected primary activity from illegal secondary activity, the Board must engage in a probing inquiry into "all the surrounding circumstances" of the case before it. Id. at 644, 87 S.Ct. 1250. The Board's opinion here appears to fall far short of that standard. Instead of the wide-ranging, flexible inquiry required by National Woodwork, the Board has applied an essentially per se rule, of the sort repeatedly rejected by this court, most recently in Enterprise Ass'n, supra, at 905.
 
 
 27
 The petitioner, Local 391, International Brotherhood of Teamsters (the Union) represents construction employees at one unincorporated division (Mideast) of the Vulcan Materials Company (Vulcan). At issue here is the Union's asserted right to extend its lawful picketing of that division to a second unincorporated division (Chattanooga) of the same company. The NLRB found that these two divisions constitute separate "persons" for the purposes of § 8(b) (4)(B) of the National Labor Relations Act, 29 U.S.C. § 158(b)(4)(B), and that the Union's action in extending its picketing from one division to the other was therefore an illegal secondary boycott.
 
 
 28
 The rule upon which the Board rests its decision is deceptively simple: "(S) eparate corporate divisions are separate 'persons,' . . . if neither the division nor the parent exercises actual or active, as opposed to merely potential, control over the everyday operations or labor relations of the other." App. at 5 (emphasis added). Although the Trial Examiner (whose opinion was adopted by the Board) mentioned a number of other facts contained in the record tending to support his conclusion that the divisions were largely autonomous, it is clear that, for him, it was the lack of day-to-day control of the divisions' labor relations which was dispositive:
 
 
 29
 I have heretofore found that Vulcan did not maintain actual or active control of the labor relations policies of either Chattanooga or Mideast. I therefore conclude that, on the facts here presented, Chattanooga was an unoffending employer and a Statutory "person" during the course of Respondent's dispute with Mideast. Accordingly, I conclude that, by picketing Chattanooga on and after October 20, Respondent violated Section 8(b)(4)(B) of the Act. (App. at 10).
 
 
 30
 The extent of Vulcan's control over the labor relations policies of Mideast and Chattanooga was certainly a relevant factor to be considered by the Board in determining whether those two divisions constituted separate "persons." But it was not the only relevant factor. See Local No. 627, International Union of Operating Engineers v. NLRB, 171 U.S.App.D.C. 102, 107, 518 F.2d 1040, 1045 (1975), aff'd on this point, 425 U.S. 800, 805, 96 S.Ct. 1842, 1844, 48 L.Ed.2d 382, 386 (1976). As has frequently been pointed out, the purpose of § 8(b)(4)(B) is "to prohibit coercive union activity that is directly exerted against an 'unconcerned' or 'neutral' employer, drawn by the union's activities into 'disputes not his own.' " Enterprise Ass'n, supra, at 894, quoting National Woodwork, supra. In assessing the "neutrality" of a supposedly "secondary" employer, there is no single factor or criterion upon which the Board may rely. "In the final analysis, . . . the question of neutrality cannot be answered by the application of a set of verbal formulae." Vulcan Materials Co. v. United Steelworkers of America, 430 F.2d 446, 451 (5th Cir. 1970), cert. denied, 401 U.S. 963, 91 S.Ct. 974, 28 L.Ed.2d 247 (1971). What is called for is "a realistic, common sense evaluation of neutrality," not "a technical exercise in the intricacies of corporate structure . . . ." NLRB v. Local 810, Steel, Metals, Alloys, and Hardware Fabricators, 460 F.2d 1, 6 (2d Cir. 1972).
 
 
 31
 Certainly a "common-sense" evaluation of the "neutrality" of a corporation vis-a-vis its own divisions must include some consideration of the extent to which the corporation is or appears to be able and willing to support its divisions (financially and otherwise), if they should become involved in protracted labor disputes. A division which can count on this sort of real or apparent backstopping from its corporate headquarters will obviously have greater bargaining strength than a division which truly stands alone. While the importance of this consideration would seem to be self-evident, neither the Board's opinion nor the panel's even makes reference to it.[2]
 
 
 32
 Because of the Board's failure to take this consideration into account, its analysis of the participation of two corporate officials (Whitten and Majors) in the divisions' labor negotiations seems to be somewhat beside the point. In the Board's view, the role played by these two officials was at the "crux" of this case. App. at 8. Thus, it was the Board's finding that Whitten and Majors participated in the negotiations only at the invitation of the divisional presidents and that "they served simply in an advisory capacity during bargaining sessions" which led the Board to conclude that "Vulcan did not exercise a centralized control of the labor relations of its divisions." App. at 8-9. And, as noted supra, it was because of this lack of "centralized control" that the Board found the divisions to be separate "persons." This analysis completely overlooks the other, potentially more important questions raised by the activities of Whitten and Majors viz., whether the corporation, by allowing its officials to participate in divisional negotiations, was able to obtain a tactical advantage against the union, which might reasonably have concluded from their presence that it was facing the full economic might of the corporation; and whether the divisions, by inviting the participation of the corporate officials and by heeding their advice, was able to insure itself of corporate support in any ensuing labor disputes. These questions seem far more relevant to the ultimate issue of "neutrality" than the largely formal questions upon which the Board and the panel focused.[3]
 
 
 33
 Section 8(b)(4)(B) has been described as an accommodation between the "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own."[4] (1951). This accommodation is an uneasy one, which requires the Board, and the courts, to engage in "the drawing of lines more nice than obvious . . . ."[5] But however difficult this task may be, the Board cannot properly fulfill its responsibilities by relying on mechanical tests and per se rules, which "subvert ( ) the congressional purpose by focusing on only one among many potentially relevant factors." Enterprise Ass'n, supra at 905.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 The two cases upon which the panel relies, American Fed. of Television and Radio Artists v. NLRB, 149 U.S.App.D.C. 272, 462 F.2d 887 (1972), and Los Angeles Newspaper Guild, Local 69 v. NLRB, 443 F.2d 1173 (9th Cir. 1971), enfg. 185 N.L.R.B. No. 25 (1970), cert. denied, 404 U.S. 1018, 92 S.Ct. 681, 30 L.Ed.2d 666 (1972), are similarly narrow. Indeed, one of the more troubling aspects of this case is the Board's apparent eagerness to derive from these two narrow holdings a broad, generally applicable per se rule
 
 
 [2]
 The panel notes that the "independence" of the Vulcan divisions appears to be "genuine" and that "(a) specious intra-corporate arrangement, contrived to take advantage of the protection of the secondary boycott provisions of the Act, obviously would stand on a different footing." Slip op. at 8. While I am not convinced that the Board's inquiry here was sufficiently thorough to uncover a "specious intra-corporate arrangement," that is not really the source of my concern. Rather, I am concerned that the kind of corporate backstopping I have described may enable even genuinely "independent" divisions to enhance their bargaining positions significantly
 
 
 [3]
 Compare the recent opinion of the Eighth Circuit in Royal Typewriter Co. v. NLRB, 533 F.2d 1030 (8th Cir., 1976). In that case the Board had determined that Litton Industries, along with its wholly owned subsidiary Litton Business Systems, and the latter's unincorporated Royal Products Division all constituted a "single employer" for the purpose of assessing responsibility for certain unfair labor practices. The Court affirmed, and provided the following guidance on the standards which should govern "single employer" determinations:
 In assessing the appropriateness of single employer treatment, the fact that day-to-day labor matters are handled at the local level is not controlling. A more critical test is whether the controlling company possessed the present and apparent means to exercise its count in matters of labor negotiations by its divisions or subsidiaries and whether its course of conduct encouraged or permitted the local negotiators to so represent the situation to union negotiators for the purpose of achieving a tactical or strategic objective. The presence of Irwin (Litton's director of labor relations) when some . . . representations were made gave additional credibility to the statements. We do not think that a conglomerate can act in negotiations as a single employer and then expect to avoid the consequences if unfair labor practice charges result from such conduct.
 At 1043 (citations omitted).
 See also American Federation of Television and Radio Artists Baltimore Local, 185 NLRB No. 26, at 594 (1970) (Member Brown dissenting).
 
 
 [4]
 National Woodwork, supra, 386 U.S. at 626-7, 87 S.Ct. at 1259, quoting NLRB v. Denver Bldg. and Constr. Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951)
 
 
 [5]
 National Woodwork, supra, 386 U.S. at 645, 87 S.Ct. at 1268, quoting Local 761, Electrical Workers v. Labor Board, 366 U.S. 667, 674, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961)