462 F.2d 887
 80 L.R.R.M. (BNA) 2001, 149 U.S.App.D.C. 272,
68 Lab.Cas. P 12,618
 AMERICAN FEDERATION OF TELEVISION AND RADIO ARTISTS,
WASHINGTON-BALTIMORE LOCAL, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Baltimore News American Division, the Hearst Corporation, Intervenor.
 No. 24641.
 United States Court of Appeals,
 District of Columbia Circuit.
 Argued Oct. 26, 1971.
Decided April 17, 1972.
 
 Mr. Bernard W. Rubenstein, Baltimore, Md., for petitioner.
 Mr. Baruch A. Fellner, Atty., N.L.R. B., with whom Messrs. Arnold Ordman, Gen. Counsel at the time the brief was filed, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., were on the brief, for respondent.
 Mr. James J. Doyle, Jr., Baltimore, Md., with whom Mr. Meade C. Patrick, Washington, D. C., was on the brief, for intervenor.
 Before WILBUR K. MILLER, Senior Circuit Judge, and TAMM and ROBB, Circuit Judges.
 ROBB, Circuit Judge:
 
 
 1
 The question in this case is whether the record supports the finding and conclusion of the National Labor Relations Board that two unincorporated divisions of The Hearst Corporation must be treated as separate "persons" in applying the secondary boycott provisions of the National Labor Relations Act. Sec. 8(b) (4) (i)-(ii) (B), 29 U.S.C. Sec. 158(b) (4) (i)-(ii) (B) (1970). We think the Board's decision is supported by the record as a whole.
 
 
 2
 WBAL Television, The Hearst Corporation, (WBAL) maintains and operates radio and television stations in Baltimore, Maryland. Baltimore News American Newspaper Division, The Hearst Corporation, (News American) publishes and distributes a daily and Sunday newspaper in Baltimore. WBAL and the News American are divisions of The Hearst Corporation, a Delaware corporation, whose principal offices are in New York City. American Federation of Television and Radio Artists, Washington-Baltimore Local, AFL-CIO, (AFTRA) is a union that for many years represented WBAL's staff announcers and employees appearing before cameras and microphones.
 
 
 3
 The collective bargaining agreement between AFTRA and WBAL expired on September 1, 1968. On September 21, after negotiations for a new contract were broken off, AFTRA struck and picketed WBAL in support of its demands. Two days later, in furtherance of its dispute with WBAL, the Union picketed the News American premises in Baltimore, six miles from WBAL. Although the News American employees were not members of AFTRA, some of them refused to cross the picket line, forcing the newspaper to curtail publication, distribution and circulation.
 
 
 4
 In response to a petition by the Regional Director of the Board, the United States District Court for the District of Maryland enjoined the picketing of the News American. The court held that this picketing violated the secondary boycott provisions of the National Labor Relations Act. Penello v. American Federation of Television and Radio Artists Washington-Baltimore Local, AFL-CIO, 291 F.Supp. 409 (D.C.Md.1968). Also, upon a charge filed by the News American, the Regional Director issued a complaint alleging that AFTRA had engaged in prohibited secondary boycott activities. More specifically, the complaint alleged that, in furtherance of its labor dispute with WBAL, AFTRA picketed the premises of the News American, a secondary or neutral employer, with the objects of (a) inducing employees of the News American to strike or withhold their services, and (b) forcing or requiring the News American to cease doing business with WBAL and customers and suppliers of the News American.
 
 
 5
 After a hearing, at which the evidence was substantially undisputed, the trial examiner found that the charges were sustained, and he recommended that AFTRA be ordered to cease and desist from its unfair labor practices. The Board, with one member dissenting, adopted the examiner's decision. The Union now petitions for review and the Board applies for enforcement of its order.
 
 
 6
 Section 8(b) (4) of the National Labor Relations Act, 29 U.S.C. Sec. 158(b) (4), provides, in relevant part, that it shall be unfair labor practice for a labor organization:
 
 
 7
 (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to . . . transport, or to otherwise handle or work on any goods . . . or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is-
 
 
 8
 ******
 
 
 9
 * * *
 
 
 10
 (B) forcing or requiring any person to cease . . . handling, transporting, or otherwise dealing in the products of any other producer . . . or to cease doing business with any other person . . . Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing . . . . (Emphasis supplied)
 
 
 11
 Section 2(1) of the Act, 29 U.S.C. Sec. 152(1), provides:
 
 
 12
 The term "person" includes one or more individuals, labor organizations, partnerships, associations, corporations, legal representatives, trustees, trustees in bankruptcy, or receivers.
 
 
 13
 The Union argues, as it has from the beginning of this litigation, that WBAL and the News American are not separate "persons" within the meaning of the Act, and that the News American therefore cannot be a neutral "person" entitled to the protection of the secondary boycott provisions.
 
 
 14
 At the outset the Union contends that the "plain language of the statute" demonstrates that the News American cannot be a separate "person". The argument is that the definition of a "person" in section 2(1) of the Act does not include or refer to an unincorporated division of a corporation, that "according to Section 2(1) of the Act, the only 'person' for the purposes of Sections 8(b) (4) (i) and (ii) (B) is The Hearst Corporation itself, and the separate operating divisions of The Hearst Corporation are merely parts of one 'person'". (Emphasis in original) We do not find the argument persuasive.
 
 
 15
 Section 2(1) of the Act states that the "term 'person' includes one or more individuals, labor organizations, partnerships, associations, corporations * * * or receivers." (Emphasis added) We think that as used in this context the word "includes" is a term of enlargement, not of limitation, and that the reference to certain entities or categories is not intended to exclude all others. See Federal Land Bank v. Bismarck Lumber Co., 314 U.S. 95, 99-100, 62 S.Ct. 1, 86 L.Ed. 65 (1941); Argosy Limited v. Hennigan, 404 F.2d 14, 20 (5th Cir. 1968); United States v. Gertz, 249 F.2d 662, 666 (9th Cir. 1957); Penello v. American Federation of Television & Radio Artists Washington-Baltimore Local, AFL-CIO, 291 F.Supp. 409, 414 (D.C.Md.1968). The statute must be construed in light of the congressional purpose, which is "to confine labor conflicts to the employer in whose labor relations the conflict had arisen, and to wall off the pressures generated by that conflict from unallied employers." Miami Newspaper Pressmen's Local No. 46 v. NLRB, 116 U.S.App.D.C. 192, 197, 322 F.2d 405, 410 (1963). The Act has "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." NLRB v. Denver Building & Construction Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951). The question therefore is not whether legally the News American is a separate corporation but whether it is in fact an autonomous and unoffending employer. If it is autonomous and unoffending, the News American does not forfeit the protection of the Act because of its technical corporate status; the potential for harmful consequences that the Act seeks to avoid is the same whether WBAL and the News American are separate corporations or separate and autonomous "divisions" of one corporation.
 
 
 16
 The trial examiner and the Board concluded from the evidence that WBAL and the News American were operated as separate autonomous entities and that the News American was therefore a "person" under section 8(b) (4) of the Act, entitled to protection against secondary pressures. In our opinion the record as a whole supports this conclusion.
 
 
 17
 The record discloses that The Hearst Corporation, with headquarters in New York City, comprises more than twenty separate divisions. These divisions publish newspapers in Seattle, San Francisco, Los Angeles, San Antonio, Boston, Albany, New York, and Baltimore. Television and radio stations are maintained by divisions in Pittsburgh, Milwaukee, Puerto Rico, and Baltimore. Other divisions operate or maintain motion picture studios, cattle ranches, real estate enterprises and timberlands.
 
 
 18
 Hearst's three executives in New York are its president, executive vice-president and treasurer. As chief executive, the president appoints division heads, including publishers of newspapers and general managers of television and radio stations. Brent Gunts is general manager of WBAL-TV, Alfred Burk is general manager of WBAL-Radio, and Mark Collins is publisher of the News American. Each has the corporate title "Vice-President"; for example, Gunts is designated "Vice-President and General Manager, WBAL Division, The Hearst Corporation" (the television and radio stations together compose one division, known as WBAL). None of the vice-presidents sits on Hearst's board of directors, but each is responsible to Hearst's president and executive vice-president. Hearst President Richard A. Berlin testified that he has instructed his division heads to "run it [the division] as if they owned it", but that he has also informed them that "if the time came that they were not doing what I considered a satisfactory job * * * then we would relieve them and put someone else in. . . ."
 
 
 19
 The record supports the finding of the Board that in practice the division heads of the News American and WBAL have substantially complete authority in the day to day operations of their respective divisions. Mr. Berlin emphasized that although division heads would occasionally communicate with the Hearst executives, whom they regarded as their superiors, it was only the "bottom line" of the periodic reports, reflecting a division's financial condition, that interested him.
 
 
 20
 Publisher Collins of the News American has final and complete authority in setting and carrying out the newspaper's policy with respect to news, editorials, production, advertising, and circulation. He also determines the size of his staff, hires and fires personnel, fixes salaries, sets advertising rates and service charges, and formulates and carries out labor relations policies. Gunts and Burk exercise similar authority in their division.
 
 
 21
 Collective bargaining agreements between the two Baltimore divisions and labor organizations are negotiated and administered by the division heads. Each division negotiates its own labor agreements independently of the other and of Hearst. Gunts and Burk negotiated the most recent contract with AFTRA for WBAL, and Collins and one of his subordinates negotiated with other unions for the News American. Although the contract between AFTRA and WBAL that expired in September 1968 provided that it "shall not become binding and effective * * * until it has been countersigned" by an "appropriate executive of the Hearst Corporation", no such provision appears in any News American contract with a labor organization. Moreover, WBAL manager Gunts testified that he now has final authority to conclude and sign a collective bargaining agreement "without reference to New York", and that since November of 1966 he has "had no contact at all with New York" concerning any aspect of labor relations policy. The News American has contractual relations with eleven labor organizations with whom it has fourteen signed contracts. The negotiations with six of the eleven unions were conducted jointly with the Baltimore Sun which is not a Hearst newspaper. None of the employees of the News American is represented by AFTRA.
 
 
 22
 WBAL and the News American are represented by the same Baltimore attorneys in legal matters, including labor relations problems, but neither seeks nor obtains advice or guidance from Hearst's New York legal department or labor relations staff.
 
 
 23
 WBAL and the News American subscribe separately to news services such as the Associated Press and United Press. Each is free to use any or none of the Hearst services and features such as Hearst Headline Service, King Features, or syndicated columns. Each controls its own editorial policies.
 
 
 24
 There is a direct telephone line connecting WBAL and the News American. WBAL announces on the air that it is "the News American Station" or is "affiliated with the News American" and that it has a direct line "to the News Division and NBC". Except for these superficial connections, however, the two divisions are competitors. Each employs its own news gathering staff; an arrangement for the exchange of news between the two proved unsuccessful because of rivalry between the newspaper city room and the television station, and was abandoned after a brief trial. WBAL advertises in the News American and the News American advertises over WBAL. This advertising is purchased by each division pursuant to contract at the same rates paid by all other advertisers.
 
 
 25
 From time to time each division has contracted for the services of a "personality" employed by the other. For example, WBAL has engaged News American reporters and writers to broadcast or serve on discussion panels and the News American has engaged a WBAL employee to write a column for the newspaper. When so engaged, however, such persons are treated as individual contractors independent of their own divisions. Thus, WBAL has contracted to pay the sports editor of the News American for each broadcast or telecast. This agreement is not subject to confirmation by the News American or Hearst, and may be terminated at any time without reference to them. WBAL hires employees of other newspapers and news services on a similar basis.
 
 
 26
 Hearst makes available to its divisions certain insurance, pension and salary continuation plans or programs. Each division head, however, is free to accept or reject these plans for his division. WBAL uses a major medical and hospitalization plan which has no relationship to Hearst although an alternate Hearst plan is available. One WBAL pension plan is available only to radio and television employees represented by labor unions; and some of the plans in effect at the News American were negotiated between it and labor organizations representing its employees.
 
 
 27
 Each division maintains its own separate financial system, pays its own bills, makes its own collections, and has separate bank accounts from which it pays salaries and wages. Each division also prepares its own financial statements and budgets. Although these are submitted to Hearst in New York, the evidence is that they are sent largely for information and have never been questioned by Hearst. The division heads may incur operating expenses without limitation, but capital expenditures in excess of $10,000 require Hearst approval.
 
 
 28
 We think this summary of the evidence amply supports the Board's conclusion that at the time of the labor dispute WBAL and the News American were so independent of Hearst and so unrelated to each other that the News American was an unoffending employer within the meaning of the statute. True, the ultimate power to control each division belonged to Hearst, since each division manager was answerable to Hearst. As the Board correctly held, however, the test is not whether an unexercised power to control exists. "There must be in addition such actual or active common control, as distinguished from merely a potential, as to denote an appreciable integration of operations and management policies." Drivers, Chauffeurs and Helpers Local No. 639 (Poole's Warehousing, Inc.), 158 N.L.R.B. 1281, 1286 (1966). See Miami Newspaper Pressmen's Local No. 46 v. NLRB, 116 U.S.App.D.C. 192, 195-196, 332 F.2d 405, 408-409 (1963); San Francisco-Oakland Newspaper Guild v. Kennedy, 412 F.2d 541, 545 (9th Cir. 1969); J. G. Roy & Sons Co. v. NLRB, 251 F.2d 771, 773-774 (1st Cir. 1958). Here the record establishes that The Hearst Corporation's ultimate power to control has not been exercised. With respect to all matters except capital expenditures exceeding $10,000, Gunts, Burk and Collins have exercised final and independent control over their divisions. They have had complete discretion in the areas of management policy, labor relations, production, purchasing, and all other aspects of planning and operation which might touch on labor's interests in this dispute. Their responsibility to Hearst for their divisions' financial performance does not detract from their independence.
 
 
 29
 In their operations WBAL and the News American are competitors, dealing with each other at arms length. Neither division has confided in the other or sought the other's counsel with respect to labor relations matters. Labor policies have been independently formulated and labor contracts independently negotiated and concluded. We find it difficult to imagine two more independent divisions, whether they be unincorporated or incorporated separately.
 
 
 30
 Finding ample support for the Board's conclusions that common active control of the two divisions does not exist and that the News American is therefore an unoffending employer, not concerned in WBAL's labor dispute, we dismiss the petition for review and enforce the Board's order.