**UNITED TELEGRAPH WORKERS, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

**Western Union Telegraph Company and Western Union Corporation et al., Intervenors.**

**No. 76–1505.**

United States Court of Appeals, District of Columbia Circuit.

Argued 1 June 1977.

Decided 24 Feb. 1978.

Isaac N. Groner, Washington, D. C., with whom Neal M. Sher, Washington, D. C., was on the brief, for petitioner.

Richard B. Bader, Atty., N. L. R. B., Washington, D. C., with whom John S. Irving, Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and Robert G. Sewell, Atty., N. L. R. B., Washington, D. C., were on the brief, for respondent.

Thomas M. Healy, New York City, was on the brief, for intervenor, The Western Union Telegraph Co.

Thomas L. Morrissey, Newark, N.J., was on the brief for intervenors, Western Union Corp., et al.

Before BAZELON, Chief Judge, and TAMM and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

This case presents the question of the collective bargaining obligations of a group of interrelated corporations. The United Telegraph Workers (the Union) long have been the collective bargaining representative of employees of Western Union Telegraph Co. (Telegraph). During 1969–73, Telegraph reorganized itself into a parent holding company and five subsidiaries. Telegraph, the common carrier, became the major subsidiary; its various non-FCC-regulated operations were spun off into four other subsidiaries. Following this corporate reorganization, the Union demanded that it be recognized as the collective bargaining representative, not only of the employees of Telegraph, but also of the employees of the parent and four other subsidiary corporations. These corporations refused to recognize the Union. The Union filed an unfair labor practice charge with the National Labor Relations Board, asserting that the six corporations constituted a "single employer" for purposes of collective bargaining, and that these corporations (excepting Telegraph) had unlawfully refused to recognize and bargain with it in violation of § 8(a)(1) and (5) of the National Labor Relations Act.[1] Reversing the Administrative Law Judge (ALJ), a divided panel of the Board found that each corporation was a "separate and independent entity," and that the six corporations therefore did not constitute a "single employer"; accordingly, it held that Telegraph's bargaining obligations "had no application" to the parent or four other subsidiaries, and dismissed the complaint.[2] The Board's findings were amply supported by substantial evidence in the record, and we affirm on the basis of its opinion. We write briefly to address the suggestions aired by our dissenting colleague.

* * * * *

---

1. 29 U.S.C. § 158 (1970):

  (a) It shall be an unfair labor practice for an employer—
  (1) to interfere with, restrain, or coerce employees in the exercise of the rights [to organize and bargain collectively] guaranteed in [§ 7 of the NLRA];

  (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of [§ 9(a) of the NLRA].

2. The ALJ's decision is reported at 224 N.L.R.B. 279 (1976). The Board's decision is reported in *id.* at 274, 92 L.R.R.M. 1443 (1976).

■ As in other areas of the law, corporations normally are treated as separate entities under the Labor Act. The Board treats multiple corporations as a single employer only when it is established that the nominally separate corporations are in fact operated as a single integrated business enterprise. As explained approvingly by the Supreme Court in 1965, the Board weighs four factors in ascertaining whether several businesses are sufficiently integrated to be treated as one: (1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control.[3] After careful consideration of the facts, the Board concluded that of these "four key elements . . . only common ownership is present here."[4] Because common ownership is necessarily a feature of any conglomerate organization, and because common ownership is not determinative where common control is not shown,[5] the Board held that the Union failed to demonstrate that the six corporations were a single employer.

■ Our dissenting colleague concedes that the record contains substantial evidence to support the Board's findings that

these six corporations were not a single employer.[6] He denies, however, that disposition of this case can rest solely on consideration of the elements comprising the "single-employer" test, and would remand to let the Board consider whether the "alter-ego" and "successorship" doctrines are relevant to the circumstances of this case. We disagree.

First, we think that the "single-employer" test adequately disposes of this litigation. In *Local 627, IUOE v. NLRB*,[7] this Court squarely held that the collective bargaining obligations of integrated parent/subsidiary corporations under NLRA § 8(a)(1) and (5) were to be determined by means of the four-factor "single-employer" test that the Board used here. From the outset the litigation has proceeded on this assumption; from the outset the parties have done no more than dispute as to how facts under the "single-employer" test should be found.[8] If there is any doubt that the "single-employer" test is adequate to dispose of this case, it has never been expressed by this Court, by any other court, by any of the parties to this litigation, or by any of the expert decisionmakers who have considered the case thus far.

---

**3.** *Radio & Television Broadcast Technicians Local 1264 v. Broadcast Serv.*, 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965) (per curiam), *quoted with approval in South Prairie Constr. Co. v. Local 627, IUOE*, 425 U.S. 800, 802 & n.3, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976).

**4.** 224 N.L.R.B. at 276, 92 L.R.R.M. at 1446.

**5.** *E. g., AFTRA v. NLRB*, 149 U.S.App.D.C. 272, 462 F.2d 887, 892 (1972); *NLRB v. Welcome-American Fertilizer Co.*, 443 F.2d 19, 20–21 (9th Cir. 1971). *See Local 627, IUOE v. NLRB*, 171 U.S.App.D.C. 102, 518 F.2d 1040, 1044–47 (1975), *aff'd in relevant part and remanded on other grounds sub nom., South Prairie Constr. Co. v. Local 627, IUOE*, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 782 (1976).

**6.** Dissenting op. at 571 F.2d 670 & n.11.

**7.** 171 U.S.App.D.C. 102, 518 F.2d 1040, 1045–47 (1975), *aff'd in relevant part and remanded on other grounds sub nom., South Prairie Constr. Co. v. Local 627, IUOE*, 425 U.S. 800, 802–04 & n.3, 96 S.Ct. 1842, 48 L.Ed.2d 782 (1976).

**8.** In its charge, the Union alleged that the six "nominally separate corporations [were] under the Act a single integrated enterprise and/or a single employer." App. 7. The General Counsel, the Union, and the corporations alike rested their cases before the ALJ on the "single-employer" rationale. App. 115–17. The ALJ stated that the "primary issue is whether the holding company and the various new subsidiaries are, in substance, . . . merely segments or departments of [Telegraph], which continues to operate as a single integrated enterprise," App. 79, and made detailed findings on each of the four factors of the "single-employer" test. App. 117–25. Reversing the ALJ, the Board made different factual findings on each of these four factors, and concluded that the corporations did not "constitute a single employer." 224 N.L.R.B. at 274, 92 L.R.R.M. at 1444. Member Fanning agreed that the "single-employer" test disposed of the case, and dissented on factual grounds. *Id.* at 277–79, 92 L.R.R.M. at 1447–49. The parties, on brief and oral argument to this Court, have agreed that the "single-employer" test disposes of the case, and merely rehearsed the factual dispute that divided the Board.

Second, we think that remand for further consideration would serve no purpose. Remand for consideration of the "alter-ego" doctrine would be redundant, for in ascertaining under the "single-employer" test whether the various corporations have interrelated operations, common management, common ownership, and centralized control of labor relations, the Board plainly made factual findings akin to any it would make under an "alter-ego" rubric.[9] Remand for consideration of the "successorship" doctrine would be futile, and unjustifiable in any event. The General Counsel, representing the charging party before the ALJ, stated that the successorship doctrine was inapplicable.[10] The charged parties agreed that "the doctrine of successorship 'would require radical transformation' to be applicable" here.[11] The ALJ concluded that this case "[did] not involv[e] . . . a successorship situation."[12] The successorship doctrine was not mentioned by the majority or dissenter on the Board, nor by any party on brief or on oral argument to this Court. There is simply no reason to remand this case to an expert agency for consideration of a theory which both it and all parties before it have at all times agreed is irrelevant.

Our role in this case is to affirm the Board's decision if its decision is supported by substantial evidence in the record. We all agree that the Board's decision is supported by substantial evidence in the record and its decision according is

*Affirmed.*

BAZELON, Chief Judge, dissenting:

This case concerns the legal principles governing the bargaining obligations of an employer that "spins off" portions of its business to wholly-owned subsidiaries. Relying primarily on our recent decision in *Local 627, International Union of Operating Engineers v. NLRB,*[1] the court today upholds the Board's consideration of four criteria—common ownership, common management, interrelationship of operations, and centralized control over labor relations. Although these are valid criteria, they do not. include all the relevant considerations in cases involving reorganization through "spin offs." *Local 627* concerned the bargaining obligations of two competing companies that had intermingled their operations but maintained separate work forces.[2] Here, by contrast, the union contends that the employer simply incorporated its existing divisions, and subsequently hired nonunion employees to replace members of the union. Previous Board and court decisions concerning similar problems reveal consideration of other factors, such as (a) whether the reorganization was motivated by an intention to avoid obligations to the union, and (b) whether, from the perspective of the employees, the employing enterprise has

---

9. Indeed, the ALJ made explicit findings on the "alter-ego" theory, App. 87, and his findings were implicitly rejected by the Board.

10. App. 115.

11. App. 116.

12. App. 127.

1. 171 U.S.App.D.C. 102, 518 F.2d 1040 (1975), aff'd in relevant part sub nom., *South Prairie Construction Co. v. Local 627, Int'l. Union of Operating Engineers,* 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 782 (1976).

2. *Local 627* concerned two commonly-owned construction companies, South Prairie, located in Nebraska, and Kiewit Sons', located in Oklahoma. South Prairie was nonunionized, but employees of Kiewit Sons' were members of a union. The dispute arose after South Prairie

commenced operations in Oklahoma and competed for available work there with Kiewit Sons'. The union challenged South Prairie's refusal to bargain with it on grounds that the two companies were centrally controlled and had so substantially intermingled their operations as to comprise a "single employer" in fact. This case would be identical if the union's claim were merely that Western Union had established new corporate subsidiaries to compete with existing divisions of the old company, and that these subsidiaries and divisions had substantially intermingled their operations. This is not, however, what the union alleges—it maintains that Western Union simply gave corporate form to its existing divisions. Under these circumstances—where the unionized operations allegedly cease to exist—additional questions arise, as discussed below.

remained essentially the same. The Board in this case gave inadequate attention to union animus and none at all to the perspective of the employees. For these reasons I would remand to the Board for further consideration and, if needed, additional proceedings.

## I

Our national labor policy has long embraced the principle that, to ensure fairness to employees, the duty of an employer to bargain with a union must sometimes be imposed on another, nominally separate business entity. Such an obligation has been found to exist by the NLRB and the courts in a variety of factual settings.

One such set of circumstances has led to what is referred to as the "alter ego" doctrine. As one commentator has described it, this doctrine applies where "a technical change in employer identity is merely incident to the former employer's attempt to disguise its continuance because of that employer's union animus or an unlawful motive to avoid the commands of national labor laws." [3] In such situations the "new" employer is deemed the alter ego of the former employer and is held responsible for the former employer's labor obligations, since the law views them as the same employer in fact. [4]

A second such set of circumstances has resulted in what is known as the doctrine of employer "successorship." The sale of an enterprise is perhaps the simplest situation in which successorship might apply. [5] The concept has been utilized, however, in a great number of circumstances, as described in the margin, including corporate reorganization. [6] In each instance the crucial inquiry is whether, after one employer transfers its assets to another, there nevertheless remains "substantial continuity of identity in the business enterprise" [7] from the vantage of the employees. [8]

**3.** Slicker, *A Reconsideration of the Doctrine of Employer Successorship—A Step Toward a Rational Approach*, 57 Minn.L.Rev. 1051, 1064 (1973) (hereinafter cited as "Slicker").

**4.** *See, e. g., NLRB v. Southport Petroleum Co.*, 315 U.S. 100, 62 S.Ct. 1113, 85 L.Ed. 1519 (1942); *NLRB v. Herman Brothers Pet Supply, Inc.*, 325 F.2d 68 (6th Cir. 1963); *NLRB v. Ozark Hardwood Co.*, 282 F.2d 1 (8th Cir. 1960); *NLRB v. Weirton Steel Co.*, 135 F.2d 494 (3d Cir. 1943); *Associated Trans. Co.*, 194 N.L.R.B. No. 12 (1971).

**5.** *See, e. g., Chemrock Corp.*, 151 N.L.R.B. 1074 (1965); *Stonewall Cotton Mills*, 80 N.L.R.B. 325 (1948).

**6.** Successorship principles were recently applied in the context of corporate reorganization in *NLRB v. DIT–MCO, Inc.*, 428 F.2d 775, 780–781 (8th Cir. 1970). Other applications have included cases where a former partnership incorporated *e. g., Dickey v. NLRB*, 217 F.2d 652 (6th Cir. 1954); *Northwest Glove Co.*, 74 N.L.R.B. 1697 (1947); where a former corporation dissolved into a partnership, *e. g., NLRB v. Adel Clay Prod. Co.*, 134 F.2d 342 (8th Cir. 1943); where a former corporation merged with another, *e. g., John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *NLRB v. Tempest Shirt Mfg. Co.*, 285 F.2d 1 (5th Cir. 1960); where the business of the former corporation was leased, *e. g., NLRB v. Armato*, 199 F.2d 800 (7th Cir. 1952); *NLRB v. Blair Quarries, Inc.*, 152 F.2d

25 (4th Cir. 1945); and where a portion of the former employer's business was assumed, *e. g., American Concrete Pipe, Inc.*, 128 N.L.R.B. 720 (1960); *Firchau Logging Co.*, 126 N.L.R.B. 1215 (1960). For further examples, *see* Slicker, *supra* note 3, at 1062–63. Slicker observes that "[t]he form of the succession, that is, the means by which the new employer gains operational control of the enterprise, has been consistently held to be immaterial to the analysis." *Id.* at 1062. *Accord, Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 182–183, n.5, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *but cf. Howard Johnson Co. v. Hotel & Restaurant Employees & Bartenders Int'l Union*, 417 U.S. 249, 257, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974).

**7.** *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 551, 84 S.Ct. 909, 11 L.Ed.2d 898 (1966) (*quoted in Howard Johnson Co. v. Hotel & Restaurant Employees Int'l Union*, 417 U.S. 249, 259, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). The *Howard Johnson* case speaks also in terms of "a substantial continuity in the identity of the work force." *Id.* at 263, 94 S.Ct. at 2244. *See* note 13 *infra.*

**8.** *E. g., NLRB v. DIT–MCO, Inc.*, 428 F.2d 775, 781 (8th Cir. 1970) ("That DIT–MCO Division initially provided the majority of all plant production and maintenance employees [to Brooks II] indicates, at least from the viewpoint of the employees, that Brooks II is a successor employer within the purview of the Act."). *See also Makela Welding, Inc. v. NLRB*, 387 F.2d 40

Yet another such set of circumstances has given rise to the "single employer" standard, which the Board applied here. The theory underlying this concept is that where several nominally separate businesses integrate their operations, thereby combining their resources and gaining leverage over their employees, they should be treated as a single employer for purposes of enforcing duties imposed by the National Labor Relations Act (the Act).[9] As mentioned above, the controlling criteria are common ownership, common management, interrelationship of operations, and centralized control over labor policies.[10]

## II

In this case I agree with the court that substantial evidence supports the Board's conclusion that the elements of single employer status have not been established.[11] My quarrel with the majority results from its refusal to recognize that, in cases involving reorganization through "spin offs," the Board may have to undertake all three of the inquiries I have described.

My position is well illustrated by the circumstances presented here. Essentially, Western Union *reorganized* itself into a holding company and five wholly-owned

(6th Cir. 1967); *NLRB v. Hurley Co.*, 310 F.2d 158 (8th Cir. 1962); *NLRB v. J. W. Rex Co.*, 243 F.2d 356 (3d Cir. 1957); *NLRB v. Lunder Shoe Corp.*, 211 F.2d 284 (1st Cir. 1954); *Witham Buick, Inc.*, 139 N.L.R.B. 1209 (1962); *Alexander Milburn Co.*, 78 N.L.R.B. 747 (1947).

In *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1966), the Supreme Court held that an employer's contractual duty to arbitrate a labor dispute survived a corporate merger. The Court's language seems particularly instructive as to the importance of viewing the successorship issue—regardless of the context in which it arises—from the perspective of the employees:

> Employees, and the union which represents them, ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental to the main considerations. The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship.

*Id.* at 549, 84 S.Ct. at 914.

9. 29 U.S.C. § 141 *et seq.*

10. *See, e. g., Radio Union v. Broadcast Services of Mobile, Inc.*, 380 U.S. 225, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965); *Sakrete of Northern California, Inc. v. NLRB*, 332 F.2d 902 (9th Cir. 1964), *cert. denied*, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965).

The majority asserts that these cases, in addition to *Local 627, supra*, establish the applicability of the single employer inquiry here. In *Radio Union, supra*, however, the Supreme Court approved such an inquiry in the context of a picketing dispute. And in *Sakrete, supra*,

the court of appeals examined the single employer criteria in the context of a dispute over whether a California corporation was obligated to bargain with the union representing employees of an Ohio corporation. The majority refers us to no case, prior to this one, in which single employer analysis was held a sufficient basis to deny the existence of a duty to bargain in the context of corporate reorganization through "spin offs."

11. This is not to say that the Board's conclusion is without difficulty. In *Local 627, supra*, we said that the critical question is whether each business entity *actually* exercises control over its policy formulation and operating decisions and there *actually* exists, as a matter of substance, the "arm's length relationship found among unintegrated companies." 171 U.S. App.D.C. at 108, 518 F.2d at 1046. Such a determination requires a probing inquiry into the underlying "realities of commercial organization," *Canton Carp's, Inc.*, 125 N.L.R.B. 483, 484 (1959); *American Fed. of Television & Radio Artists v. NLRB*, 149 U.S.App.D.C. 272, 462 F.2d 887 (1972), rather than merely "a technical exercise in the intricacies of corporate structure . . . ." *NLRB v. Local 810, Steel Metals, Alloys, and Hardware Fabricators*, 460 F.2d 1, 6 (2d Cir. 1972). In concluding that the Western Union corporate family does not comprise a single employer, the Board relied, *inter alia*, on findings that the compositions of the various corporate rosters are not identical, J.A. at 133, and that Western Union's vice president for labor relations holds no office in any of the other companies. *Id.* at 141. Such evidence hardly demonstrates that, for example, the directors of the new companies "could inaugurate or establish a labor policy . . . that did not meet with the absolute approval of the board of directors" of Western Union. *NLRB v. Royal Oak Tool & Machine Co.*, 320 F.2d 77, 81 (6th Cir. 1963); *Local 627, supra*, 171 U.S. App.D.C. at 108, 518 F.2d at 1046 n.10.

subsidiaries. The newly-created companies then refused to bargain with the union. If the evidence before the Board demonstrated that the reorganization was simply a change in corporate form precipitated by union animus, the new companies would be obligated under the alter-ego doctrine to bargain with the union.[12] Alternatively, if the evidence demonstrated that, despite reorganization, Western Union employees would view the employing enterprise as having remained substantially the same, the new companies would be obligated as successors to bargain with the union.[13] Finally, even if the new companies were created in good faith to pursue business strategies somewhat different from those in which Western Union has traditionally been engaged, the entire corporate family might

nevertheless have been deemed a single employer if the evidence had revealed substantially integrated operations and centrally controlled policies.[14]

### III

My concern here is not merely to suggest the possibility that these inquiries may be necessary in future cases involving corporate reorganization through "spin offs." Rather, the union's claims and the evidence presented to the Board by its General Counsel squarely raised the question whether reorganization of Western Union was motivated by an intention to avoid labor obligations and accomplished anything more than a change in corporate form from the perspective of the employees.[15] Moreover, the

**12.** See cases cited in note 4 *supra*.

**13.** Recent Supreme Court decisions arguably suggest that this would be true only if the new subsidiaries chose to hire a majority of Western Union's relevant work force. *See generally Howard Johnson Co. v. Hotel & Restaurant Employees & Bartenders Int'l Union*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *NLRB v. Burns Int'l Security Serv., Inc.*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1971). In those cases, however, the Court appears to have been concerned about the legitimate entrepreneurial interest of a third-party employer in choosing for nondiscriminatory reasons to rely on its own work force rather than hire its predecessor's employees. *See Howard Johnson, supra*, 417 U.S. at 259–265, 94 S.Ct. 2236. Emphatically distinguishing the alter ego line of cases, *id.* at 259 n.5, 94 S.Ct. 2236, the Court indicated it would be unfair to impose labor obligations on a third-party employer that did not choose to take advantage of continuity. *Id.* at 259–265, 94 S.Ct. 2236. In this case, unlike *Howard Johnson* and *Burns*, all of the employers are members of the same corporate family; and, as discussed below, the motives underlying the refusal to hire union employees have been called into question. Moreover, as indicated below, the corporate family as a whole did in fact choose to reap the advantages of continuity—it accomplished this through short-term contractual arrangements between Western Union and the new subsidiaries for the services of union employees. Under these circumstances, it is not clear to me that the subsidiaries' decision not to hire union employees should preclude application of successorship principles.

**14.** The cases in which a duty to bargain was imposed on a nominally separate business enti-

ty under the single employer doctrine appear, however, to concern companies engaged in substantially similar lines of business. *See, e. g., Local 627, supra; Sakrete of Northern California, Inc. v. NLRB*, 332 F.2d 902 (9th Cir. 1964), *cert. denied*, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965). Where such companies integrate their operations and are controlled centrally, fairness requires that all of them bargain with the union, since the nonunion companies could otherwise be expected to draw away union employees' work. This was precisely the concern in *Local 627*, 171 U.S.App.D.C. at 108, 518 F.2d at 1049, and would be the principal concern here as well if Western Union had established new, nonunion subsidiaries to compete with its unionized operations. *See* note 2 *infra*.

**15.** The court makes much of the fact that this litigation has proceeded to date under the single employer rubric, and emphasizes that, in proceedings before the Administrative Law Judge (ALJ), the successorship doctrine was considered by all to be inapplicable. At —— of 187 U.S.App.D.C., at 667 of 571 F.2d. What the majority overlooks is that, irrespective of the union's choice of labels, the union has consistently taken the position that from its point of view the reorganization of Western Union amounted to nothing more than a change in corporate form, Brief for Petitioner at 4–6, inspired at least in part by an intention to avoid labor obligations. *Id.* at 23, 40–47. Moreover, as indicated below, much of the ALJ's opinion was devoted to discussion of the evidence supporting this position.

Administrative Law Judge (ALJ) found that the evidence supported the union's position. The Board never articulated its reasons for rejecting some of the ALJ's findings and failing to address others. In reversing the decision of a trial examiner, the Board is required to address itself to his crucial findings and make clear its basis for rejecting them.[16]

The ALJ found that Western Union actively concealed from the union its plans to reorganize, J.A. at 112–113, and embraced a deliberate policy against transferring union employees to the new companies, *id.* at 109. The Board did not address, much less contradict, either of these findings. Also, the ALJ found that Western Union failed adequately to explain its asserted business justifications for reorganizing. *Id.* at 84–85.[17] Although the Board concluded otherwise, it did not disclose the reasons underlying its disagreement. *Id.* at 132–133.[18]

Moreover, the ALJ determined that, initially, the new subsidiaries were merely corporate shells, which became operational only by contracting with Western Union for the services of its union employees. J.A. at 89–91, 94, 96–97, 126. Many of these employees apparently continued for a time to perform the same jobs, in the same facilities, and under the same supervisors as before. *Id.*[19] Subsequently, the new subsidiaries terminated their arrangements with Western Union and hired nonunion employees to perform precisely the same tasks. *Id.* Western Union then laid off members of the union, whose services were no longer needed. *Id.* at 108–112. Yet the Board did not reveal whether it considered any of these circumstances—or their bearing on the viewpoint of union employees—in concluding that reorganization resulted in the creation of new businesses and had no adverse impact on Western Union's bargaining unit. *Id.* at 136–137.[20]

**16.** *See, e. g., Teamsters Local 769 v. NLRB*, 174 U.S.App.D.C. 310, 532 F.2d 1385, 1392 (1976); *Greater Boston Television Corp. v. FCC*, 143 U.S.App.D.C. 383, 444 F.2d 841, 853 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971); *F. W. Means & Co. v. NLRB*, 377 F.2d 683, 687–688 (7th Cir. 1967); *Local 4–243, Oil Wrkrs. v. NLRB*, 124 U.S.App. D.C. 113, 362 F.2d 943, 946 (D.C.Cir. 1966).

**17.** Western Union claimed that because of certain FCC rulings and restrictions in its corporate charter, diversification of its businesses could be accomplished only through separately incorporated entities. The ALJ found, however, that the FCC rulings to which the company referred required separate incorporation only if the company sought to engage in data *processing*, J.A. at 5–7, and that the new subsidiary allegedly created to develop and market data-processing systems had not done so in fact but simply assumed Western Union's existing data-*transmission* systems design, engineering, and marketing operations. *Id.* at 100–101. Moreover, the ALJ found that the asserted restrictions in Western Union's corporate charter had not prevented the company from engaging before reorganization in unregulated business activities identical to those now performed by the new subsidiaries. *Id.* at 84–84, 87–88, 92–95, 100–101, 103–106.

**18.** Without addressing the ALJ's findings to the contrary, *see* note 17 *supra*, the Board merely

offers the naked conclusion that Western Union's corporate charter and the FCC would permit diversification only through incorporation of separate legal entities, J.A. at 132–133, and that the new companies are engaged in unregulated businesses that "could not have [existed] and did not exist in Western Union" by reason of these restrictions. *Id.*

**19.** Such factors obviously have a crucial bearing on the determination whether the nature of the employment relationship remained substantially the same. *See, e. g., Howard Johnson Co. v. Hotel & Restaurant Employees & Bartenders Int'l Union*, 417 U.S. 249, 258, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *NLRB v. Burns Int'l Security Serv., Inc.*, 406 U.S. 272, 280 n.4, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1971); *NLRB v. Band-Age, Inc.*, 534 F.2d 1, 4 (1st Cir. 1976). For a more complete listing of the criteria the Board has considered in other cases, *see Border Steel Rolling Mills, Inc.*, 204 N.L.R.B. 814 (1973).

**20.** The Board appears to have rested its conclusion that the new subsidiaries are engaged in genuinely "new" businesses solely on a finding that their operations are *unregulated*, while Western Union's prior operations were *regulated* by the Federal Communications Commission. J.A. at 132–133. The dissenting Board member found no evidence whatsoever to support the proposition that Western Union had not previously engaged in unregulated activities identical to those now performed by the

### IV

A reviewing court has responsibility to ensure that Board decision comports with applicable legal principles.[21] To discharge this responsibility I would remand the case for consideration of the foregoing matters and for further proceedings, if the Board were so advised.

new subsidiaries. *Id.* at 142–147. The ALJ described in detail Western Union's unregulated activities prior to reorganization. *See generally* Opinion of the ALJ, J.A. at 78–129. Even if there were substantial evidence that this regulated/unregulated distinction is valid, it would hardly affect the viewpoint of employees who, regardless of FCC regulation, continued immediately after reorganization to perform the same tasks, in the same facilities, and under the same supervisors.

21. *See, e. g., NLRB v. Brown*, 380 U.S. 278, 291–292, 85 S.Ct. 980, 13 L.Ed.2d 839 (1965); *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112, 76 S.Ct. 679, 100 L.Ed. 975 (1956).