**M & S BUILDING SUPPLIES, INC.,
et al., Plaintiffs,**

v.

**Joel I. KEILER, Esquire, Defendant.**

**Civ. A. No. 81–0357.**

United States District Court,
District of Columbia.

June 14, 1983.

Geoffrey P. Gitner, Washington, D.C., for plaintiffs.

Joseph F. Cunningham, Washington, D.C., for defendants.

**DECISION AND ORDER**

JACKSON, District Judge.

Plaintiff Blake Construction Company ("Blake") is a District of Columbia close corporation engaged in the heavy construction industry, primarily in the Washington, D.C., metropolitan area. Plaintiff M & S Building Supplies, Inc., ("M & S") is also a District of Columbia corporation, formed by Blake principals in 1974 to make wholesale purchases of equipment and supplies for Blake, and is owned and managed in major part by the owners and managers of Blake.[1] Defendant Joel I. Keiler is a lawyer who lives in Virginia but practices in Washington, D.C., specializing in labor law. Plaintiffs have brought this diversity action against Keiler for damages allegedly sustained as a consequence of his legal malpractice in representing them in a labor dispute before the NLRB. Upon the facts found as hereinafter set forth in accordance with Fed.R.Civ.P. 52(a), following trial without a jury, and the conclusions of law drawn therefrom, for the reasons stated the

---

1. Until the events giving rise to this action, M & S had but a single employee whose job it was to experiment with a "tire fill" process it was developing as a sideline to repair damaged tires on construction equipment.

Court will enter judgment for the plaintiff Blake.

## I.

In February, 1978, Blake was operating in the third year of a three-year multi-employer collective bargaining agreement ("Agreement") with Local 639 of the Teamsters' Union ("Union") which was due to expire in approximately two months.[2] Until mid-1977 both Blake and the Union had treated the Agreement as covering only the six or seven truck drivers working at Blake's suburban Maryland storage and equipment facility, known as the "Landover Yard," who were members of the Union. In the summer of 1977, however, the Union's newly elected business agent suggested to Blake that its 40-to-70 other employees at the Yard, collectively referred to as "warehousemen," were also covered by the Agreement and entitled to be paid, as were the truck drivers, at the Union scale. Blake disagreed, and, on January 19, 1978, after Blake had refused to bargain with respect to some 30-odd of the warehousemen who had signed Union authorization cards, the Union filed an unfair labor practice charge with the NLRB.

On February 10, 1978, Blake's then-president, Morton Bender, called Keiler, who had handled isolated miscellaneous labor matters for him in the past, and asked Keiler to come by his office to discuss Blake's labor problem. Following that meeting between Keiler, Blake's president, and, ultimately, other Blake officials, Blake attempted to establish what is known in labor parlance as a "double-breasted" or "dual shop" operation, i.e., a non-union company operating simultaneously and in parallel with a union company within the confines of a commonly-owned enterprise. On February 17th it sub-contracted its Yard operations *in toto* to M & S, dismissing all of the Blake employees at the Landover Yard—truck drivers and warehousemen alike—on a Friday and hiring them on the M & S payroll (all, including the drivers, at sub-Union scale wages) the following Monday, thus, in theo-ry, circumventing the dispute with the Union as to the coverage of the Agreement to which M & S was not a party. The Union then amended its charge to allege the double-breasted operation to be spurious (and an additional unfair labor practice as well), adding M & S as a respondent, and on March 30, 1978, the NLRB general counsel issued his own complaint.

Keiler defended Blake and M & S at the trial in July and September, 1978, before an administrative law judge ("ALJ") who, in his June, 1979, decision, found M & S to be the *alter ego* of Blake, the entire double-breasting operation invalid, and Blake guilty of the unfair labor practices charged. The ALJ's proposed remedy, however, somewhat ambiguously appeared to apply only to those Blake/M & S employees who were originally Union members, viz., the truck drivers, but at Keiler's urging and upon his assurance that the situation "could get no worse," Blake authorized an appeal of the ALJ's decision to the NLRB. In September, 1979, the NLRB not only affirmed the ALJ but expressly expanded the bargaining unit as to which Blake would have to deal with the Union to encompass all of the employees at the Yard, presenting the likelihood of what Blake claims to have been an hitherto unanticipated substantial liability for back pay.

In the summer of 1980, Blake dismissed Keiler as its attorney and retained another firm to assess its prospects on an appeal to the U.S. Court of Appeals for the District of Columbia Circuit. Before any decision had been reached, however, the NLRB filed its own petition for enforcement. New counsel abandoned efforts to persuade the court that M & S was not the *alter ego* of Blake, arguing instead that the expansion of the bargaining unit had been accomplished *sua sponte* by the NLRB, without adequate notice and opportunity to resist having been accorded Blake, and obtained a modification of the NLRB order restoring the bargaining unit to its original dimensions, at a cost to Blake of nearly $60,000 in additional attorneys' fees. Blake and M &

---

**2.** The Agreement, between the Teamsters and the Construction Contractors Council, Inc. (of which Blake was a member), known in the trade as the "3 C's Agreement," ran from August 1, 1975, through April 30, 1978.

S had in the meantime commenced this action for legal malpractice against Keiler.[3]

## II.

Plaintiffs Blake and M & S contend that Keiler was retained on February 10, 1978, for all purposes in connection with its pending labor dispute with the Union, but, specifically, to defend against the unfair labor charge; that Keiler originated the idea of "double-breasting" and devised the manner in which it would be done, using M & S as the non-union vehicle to avoid having to bargain with the Union, without adequately investigating the likelihood of success; and that he persisted in maintaining for his clients what he knew or should have known, at least by the time of trial, to be an untenable position before the ALJ and thereafter the NLRB, until the moment he was discharged. They allege that Keiler failed to possess or exercise that degree of skill, care, and learning ordinarily possessed and exercised by other labor attorneys in the same or similar circumstances, *see Niosi v. Aiello,* 69 A.2d 57 (D.C.Mun.App.1949), *Wright v. Williams,* 47 Cal.App.3d 802, 121 Cal.Rptr. 194 (1975), and that they have sustained damages in the form of attorneys' fees and a substantial liability for back pay as a direct and proximate result of his professional negligence.

Keiler responds that on February 10th he understood he was being "consulted" generally concerning a "labor problem" with the Teamsters Union, but was not "retained" at the time for the purpose of resolving it.[4] The "labor problem," he was told, was Blake's failure to pay Union scale to its warehousemen at the Landover Yard. Keiler says he studied the Agreement and then informed the Blake officials that, in his opinion, the warehousemen were *all* "covered" by it and that Blake was "lucky to have gotten away with it this far." Only after his recommendations that the warehousemen be "brought up to scale" until the

Agreement expired or that negotiations be started with the Union's new business agent were rejected did the subject of "double-breasting" with M & S come up.

Keiler remembers the subject as being raised initially by one of the Blake officials, at which he observed that the concept would entail forming a "separate" corporation to function as the non-union shop and was told Blake already "had" such a corporation in M & S. Keiler says he was not at the outset asked for and gave no specific advice on how to accomplish the double-breasting using M & S; in fact, he was dubious about it and told the Blake officials that it seemed to him "not much better than doing business with yourself." Once the Blake officials had committed to "double-breasting," however, Keiler acknowledges that he advised that a written subcontract between Blake and M & S be drawn up "so it will look like an arm's length transaction," and then explained how to go about firing Blake's employees the following week by telling them that Blake was "going out of the trucking business" and turning over its warehouse operations to M & S which would accept applications for jobs from former Blake employees. He did not, he says, discuss with the Blake officials the wages M & S would be paying, nor, for that matter, did he discuss in any detail the other indicia of identity between the corporations: the use of the same equipment, offices, telephones, mailing address, and the like. And, although having mentioned that the "most important factor" in determining the independence of commonly-owned union and non-union companies is the degree to which day-to-day labor relations are conducted separately, he apparently saw nothing incongruous in Blake's "yard superintendent" of Friday, February 17th, materializing on Monday the 20th as M & S' "warehouse manager" who would nevertheless continue to report to the same Blake vice president.

---

**3.** The entire course of the proceedings before the NLRB, including the evidence upon which the ALJ made his findings, is summarized in greater detail in the enforcement proceeding, *NLRB v. Blake Constr. Co., Inc.,* 663 F.2d 272, at 274–78 (D.C.Cir.1981).

**4.** Keiler is uncertain when he was actually "retained" as such, although it was, of course, sometime prior to his filing of answers to the NLRB's complaint for both Blake and M & S on April 18, 1978.

The Blake officers who attended the February 10th meeting—Morton Bender, and, later, executive vice president Howard Bender, and Charles Rooney, the vice president in charge of its Yard operations—are in substantial agreement with one another (and, not surprisingly, at odds with Keiler) as to what took place. Summoned by a telephone call from Morton Bender, they say, Keiler came to Bender's office specifically to discuss his handling of the Union's "NLRB charge" against Blake. He met first with Morton Bender alone who told him that the Union was claiming that the Agreement covered all Blake's employees at the Yard, not just the truck drivers, although it had always treated it in the past as applying only to the truck drivers. Now, however, the Union had a new business agent with whom, Bender told him, unlike his predecessor, Blake had no "relationship." According to Bender, Keiler's first suggestion was that Blake try to develop such a "relationship" which Bender dismissed as impracticable because the business agent was too militant. Keiler's next and only other suggestion was to "have another corporation do the Yard work." Bender mentioned that Blake "had" M & S, and when Keiler reacted favorably, sent for his brother, Howard, and Rooney, to give Keiler such details as he might need. At no time, according to Bender, did Keiler say that he thought the Union was right about the Agreement's covering all the Yard employees, nor did he recommend awaiting its imminent expiration.[5] Keiler told him, he said, that the Union would probably continue to press the charges notwithstanding, but that Blake "should have no problems." Thus Keiler was hired, on February 10th, according to Bender, to "establish a non-union shop at Landover Yard" and "to answer the NLRB charge," and when Howard Bender and Rooney arrived, Morton Bender introduced Keiler as "our lawyer against the Teamsters" who was "going to handle our labor problem."

The Court finds that Joel I. Keiler was, in fact, hired on or about February 10, 1978—it does not matter exactly when, because he remained Blake's lawyer throughout the NLRB litigation—to represent Blake in connection with its dispute with the Union concerning its obligations to the Yard employees under the collective bargaining agreement, and that, however imprecisely defined the scope of his employment, it did include advising as to the use of M & S to "double-breast" with Blake. The Court neither gives credence nor attaches significance to Keiler's assertion that he disapproved of the "double-breasting" approach in the beginning. Not only did Keiler make no further attempt to dissuade Blake from using it during the ensuing four months before trial while he was presumably reflecting on how he would go about persuading the ALJ that the arrangement was genuine, but he was critical of the judge's finding to the contrary, upon largely undisputed evidence which left little doubt that the judge was right, when he urged Blake's appeal to the NLRB more than a year after the Agreement had expired.[6]

---

5. The Blake witnesses insist that Keiler neither looked at a copy of the Agreement nor asked to see one throughout the February 10th meeting. Keiler is equally insistent that he read a copy given him by Morton Bender at the time, and that he was generally familiar with it, anyway, from prior experience with it on behalf of other clients.

6. Keiler maintains that he told Blake all along that, while it would probably lose at the ALJ and NLRB levels, it had a "chance" of winning in the court of appeals. Within two weeks of the February 10th meeting the court of appeals for this circuit issued a decision in *United Telegraph Workers, AFL–CIO v. NLRB,* 571 F.2d 665 (D.C.Cir.1978), *cert. denied,* 439 U.S. 827,

99 S.Ct. 101, 58 L.Ed.2d 121 (1978), which, in majority and dissenting opinions, discussed in detail the problem of distinguishing, in the context of multi-corporation integrated business enterprises, between single employers, *alter egos,* spin-offs, and successors, for collective bargaining purposes, on the basis of four criteria (interrelation of operations, common management, centralized control of labor relations, and common ownership or financial control) which the NLRB had used for years to determine whether nominally separate corporations are in fact operated as a single integrated business enterprise. *Id.,* at 667. Yet in the period February through July, 1978, Keiler made no investigation of the evidence which would ultimately determine whether Blake/M & S were

Plaintiffs' experts are unequivocal in stating that if the attempt to "double-breast" was done as it was, upon Keiler's advice and as he advised, the advice was negligent.[7] The transfer of Blake's Land-over Yard operations to M & S, unaltered in any respect but name, following close upon an unfair labor charge and with no other business purpose than to elude the charging union in sight, was foreordained to convince the ALJ that the charge was well-founded. A labor lawyer of reasonable competence ought to have known it would never work; indeed, not only would not work but would probably make the problem considerably worse, because Blake had already declined to discuss its Yard employees with the Union, and the controlling law of the time made negotiations with a union mandatory before an employer sub-contracts work previously done by its union employees to an independent contractor, even if it does so for purely economic (that is, not antiunion) reasons. *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).[8]

The Court finds that whether Keiler was oblivious to those facts of the Blake/M & S relationship which made "double-breasting" in the circumstances unlawful and indefensible, or proceeded to represent Blake as he did in spite of them, he failed to meet the applicable standard of care of the ordinarily competent and diligent labor attorney in the same or similar circumstances which required the client to be told that what was being done—no matter whose idea it was initially—simply could not be done legitimately. It was incumbent upon Keiler to advise Blake that the arrangement would be found to be the subterfuge it in truth was, and his failure to do so was a direct and proximate cause of Blake's expenditures in trying to disguise it with his help.[9]

### III.

Blake paid Keiler $4,377.75 over the course of his representation of Blake and M & S. Keiler's handling of the case was misguided, and, as a consequence, the payments wasted. Blake also paid successor counsel $57,317.50 to reorient its defense, restore its credibility, and persuade the court of appeals to redefine the measure of its potential liability for back pay. In contemplation of the magnitude of that liability, and the adroitness with which successor counsel was able to alter the court of appeals' perception of Blake from that of flagrant lawbreaker to victim of an unconstitutional administrative excess (for which it accounts appropriately for the time it spent in doing so) the Court finds that fee to be fair and reasonable, and concludes that Blake is entitled to recover its payments of $61,695.25 in attorneys' fees, plus its appeal costs of $2,066.36, as damages directly and proximately caused by Keiler's professional negligence.

---

truly separate under those criteria, because, he says, Blake officials had told him they were separate, and he doesn't "ordinarily assume the client is lying to me," even though he had concluded earlier, he says, that Blake had made a "calculated decision to violate the [National Labor Relations] Act and pay the consequences later."

**7.** Defendant's experts, who audited the trial as the predicate for their opinions, premised their conclusions that Keiler had conformed to the standard of care upon the belief that he had been forced by Blake to proceed, as it were, against legal advice. The Court does not find the premise supported by the evidence.

**8.** It is unnecessary to decide whether the authority of *Fibreboard* has been diminished, as Keiler contends, by *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981) which was not decided until

long after it could possibly have had a bearing upon how Keiler would defend the case in 1978.

**9.** So transparent was the device it might have been argued that Blake itself was or should have been aware that Keiler's advice was unsound. *Compare Feld & Sons, Inc. v. Pechner, Dorfman, Wolfee, Rounick and Cabot,* 458 A.2d 545 (Pa.Super.Ct.1983). In fact, Howard Bender testified that in April, 1978, he attended a seminar on "double-breasting" in the construction industry and came away with misgivings about his own company's arrangement upon which it was about to go to trial. Keiler's answer to the complaint in this action did assert defenses of contributory negligence and assumption of risk, but he abandoned those defenses in pretrial proceedings and made no effort to revive them in any form at trial.

Blake and M & S also claim damages for an as yet unpaid (and uncalculated) liability for back pay for the Union truck drivers who were discharged from the Blake payroll at Union scale wages on February 17, 1978, and hired on the M & S payroll at substantially less three days later. Aside from being conjectural at the moment,[10] Blake's back pay liability is of a fundamentally different nature as an item of damage than its misspent attorneys' fees. It is undisputed that Blake refused to pay Union scale wages to its warehousemen from August, 1977, on. It is also undisputed that Blake reduced the truck drivers' wages of its own volition in February, 1978, and that Keiler never affirmatively assured Blake or M & S that it could pay any employee at less than Union scale with impunity at any time. After the ALJ had ruled Blake knew the pay differential was illegal and would remain so until the decision was reversed. Thus, to the extent Blake has or will sustain damage as a result of its failure to pay Union scale wages to anyone, that damage is or will have been proximately caused by Blake alone.

Therefore, for the foregoing reasons, it is, this 13th day of June, 1983,

ORDERED, that judgment be entered for plaintiff Blake Construction Co. against defendant Joel I. Keiler for $63,761.61.

---

**10.** On March 5, 1982, the U.S. Court of Appeals for the D.C. Circuit recalled its mandate in the enforcement proceeding on the application of the NLRB, ostensibly to enter an amended decree. For reasons not disclosed by the record before this Court, no amended decree has ever been issued. Consequently the amount of Blake's back pay liability, if any, remains both undetermined and indeterminable—and, of course, unpaid—at this time.