**UNITED PAPERWORKERS INTERNATIONAL UNION et al.,
Plaintiffs, Appellants,**

**v.**

**T. P. PROPERTY CORP. et al.,
Defendants, Appellees.**

**UNITED PAPERWORKERS INTERNATIONAL UNION et al.,
Plaintiffs, Appellees,**

**v.**

**KENNEBEC RIVER PULP & PAPER
COMPANY et al., Defendants,
Appellees.**

**Appeal of PENNTECH PAPERS, INC.,
and T. P. Property Corp. et al.,
Defendants.**

**Nos. 77–1528, 77–1560.**

United States Court of Appeals,
First Circuit.

Argued April 6, 1978.

Decided Sept. 11, 1978.

John J. Flaherty, Portland, Me., with whom Christopher D. Nyhan, Preti, Flaherty & Beliveau, Portland, Me., and Benjamin Wyle, New York City, were on brief for United Paperworkers International Union, et al.

John W. Ohlweiler, New York City, with whom Simpson, Thacher & Bartlett, New York City, and Curtis, Thaxter, Corey, Lipez & Stevens, Portland, Me., were on brief for Kennebec River Pulp & Paper Co., et al.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The plaintiff unions, United Paperworkers International Union and Locals 36 and 37, International Brotherhood of Firemen and Oilers, Local 270, and International Brotherhood of Machinists and Aerospace Workers, Local 559, brought suit on April 20, 1977, to compel Penntech Papers, Inc., and T. P. Property Corp. to enter arbitration with the unions concerning certain provisions of a collective bargaining agreement

between the unions and Kennebec River Pulp and Paper Co. The district court denied the motion to compel arbitration on October 21, 1977, 439 F.Supp. 610 (D.Me. 1977), and the unions appeal.

Kennebec and the unions executed the labor agreement in question on March 1, 1976. Kennebec had laid off most of its employees and discontinued operations the previous December following years of substantial losses, but Southeastern Capital Corporation, the owner of all of Kennebec's outstanding stock, was in the process of negotiating a sale of Kennebec that would bring cash into the company and enable it to resume activity. On March 3, 1976, Penntech purchased all of the Kennebec stock through T. P., a wholly owned subsidiary. T. P.'s only function was to serve as a holding company for Kennebec stock, and the district court found that T. P. was merely an "alter ego" of Penntech. Although T. P. and Penntech did not participate directly in negotiations between the unions and Kennebec, they were aware of them and suggested to Kennebec various changes in the labor agreement, including extension of its duration and modification of the Kennebec pension plan to comply with the Employee Retirement Income Stabilization Act.

After the sale of Kennebec to T. P., operations resumed at its paper mill in Madison, Maine. Unfortunately, losses continued to mount. Kennebec lost $3,000,000 on sales of $10,000,000 during 1976, and dropped another $250,000 in the first two months of 1977. The plant again closed down operations on March 29, 1977, and laid off most of its employees.

During the period Kennebec operated under Penntech ownership, Kennebec maintained its own corporate books, records, and headquarters in Madison. Kennebec had its own bank accounts, out of which it paid its employees and other business expenses, and operated the mill under its own management. All contracts between employees and management were handled by Kennebec's Office of Industrial Relations. Three Penntech employees worked at the plant and were paid by Penntech, who charged Kennebec for their services. In short, Kennebec continued to operate and hold itself out as a separate entity throughout this period, subject, as the district court found, to Penntech's ultimate control.*

After Kennebec closed down for good, the unions invoked the arbitration procedures under their 1976 agreement with Kennebec concerning various disputed matters of interest to their members arising from the closing. In doing so, they demanded that T. P. and Penntech—who were not mentioned in the 1976 agreement nor signatories to it—join with Kennebec as parties to the arbitration proceedings. Although Kennebec has agreed to arbitration, its shaky financial position makes it an unattractive bargaining partner, to say the least. T. P. and Penntech denied any obligation to arbitrate with the unions, thereby precipitating this suit.

The district court examined the federal common law that applies to suits brought under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, pursuant to the doctrine of *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), to determine whether the separate corporate identities of the defendants could be ignored in this case in order to compel arbitration. After surveying the precedents, the court concluded that the separate identities should be honored. It noted that the Supreme Court decisions, although requiring a surviving corporation in a merger to honor the arbitration obligation of the merged corporation in some instances, have not bound parent corporations to the obligations of their subsidiaries. Referring to other federal precedent regarding the proper occasions for disregarding the separate forms of a parent and its subsidiary, the court found that the circumstances of this case made piercing of the corporate veil inappropriate.

---

* The one time while Kennebec continued to conduct business activities that the unions invoked the arbitration procedures under the 1976 agreement, they sought arbitration only with Kennebec.

This dispute implicates two conflicting policies applicable to a § 301 dispute: the "federal policy of settling labor disputes by arbitration" recognized in *John Wiley & Sons v. Livingston*, 376 U.S. 543, 549, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964) (quoting *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)), and a desire not to "inhibit the free transfer of capital," and to permit "new employers . . . to make substantial changes in the operation of the enterprise." *Howard Johnson Co. v. Detroit Local Hotel & Restaurant Employees and Bartenders Union*, 417 U.S. 249, 255, 94 S.Ct. 2236, 2239, 41 L.Ed.2d 46 (1974). *See generally* Morris & Gaus, *Successorship and the Collective Bargaining Agreement: Accommodating* Wiley and Burns, 59 Va.L.Rev. 1359 (1973). The union contends that the agreement to arbitrate contained in the 1976 agreement continues to have some meaning. Defendants respond that the unions made their agreement only with Kennebec at a time when Kennebec was known to be in dire financial straits, and that nothing Penntech or T. P. have done subsequently provides a basis for extending Kennebec's arbitration obligation to them in frustration of their expectations at the time they purchased Kennebec.

We think that the district court was clearly correct in concluding that Supreme Court precedent does not control the present case. We also agree that the real issue in this case is not successorship as it is commonly understood, but whether parent corporations should be bound to the collective bargaining agreements of their subsidiaries. Clearly a question of successorship does not arise every time there is a shift in the controlling interest of stock in a corporation. No one suggests, for example, that Kennebec's original shareholders (several educational and charitable institutions) would now be bound to arbitrate with the union had they retained their stock. But even focusing on whether a parent corporation should be bound, there is no hint of any special relationship or circumstances that suggest that it would be appropriate to hold

Penntech to its subsidiary's arbitration agreement.

The district court found that,

"There is no evidence or allegation that Penntech represented to the Unions that it would be responsible for meeting the terms of the arbitration agreement. There is no evidence or allegation that Kennebec's income or assets were diverted to Penntech. There is no evidence or allegation that Penntech caused the demise of Kennebec's operations either deliberately or through mismanagement. There is no allegation or evidence that any fraud or misrepresentations by Kennebec or Penntech induced the plaintiffs to enter into the collective bargaining agreement. Indeed, the evidence on this is to the contrary. Kennebec's operations were already shut down when Penntech bought its stock. It can be fairly inferred that all parties, including the plaintiffs, hoped that Penntech's guidance and management would result in a successful operation of the mill. Had this occurred, then the provisions of the labor contract would have been fully enforceable against a profitable Kennebec." 439 F.Supp. at 621.

It is true that the district court also found that the management of Penntech, T. P. and Kennebec were so intertwined as to be almost indistinguishable, but this fact does not by itself suffice to bind the stock owners. Given the factors militating against holding Penntech to the agreement, there is no basis for ordering Penntech to arbitrate with the union.

Plaintiffs argue in their brief that the district court never fully answered one of the questions it set out for analysis, that is, whether any major federal policy required piercing the corporate form in this case to bind the parent to its subsidiary's agreement. We have no difficulty in answering that question. Given the above facts, an order to Penntech to arbitrate with the union could only be based on a policy that a holding parent corporation should be bound to the arbitration agreement of its subsidiary whenever it controls its subsidiary's stock and participates in its management.

No such policy has yet been adopted by Congress or the courts.

What little lower court precedent is available suggests that Penntech should not be bound. This court, in determining which of two separate bargaining agreements applied to employees of a merged corporation, regarded the merger, and not the earlier purchase of all the merged corporation's stock by the merging corporation, as the significant event for purposes of § 301. *Bath Iron Works Corp. v. Bath Marine Draftsmen's Assn.*, 393 F.2d 407, 411 n.5 (1st Cir. 1968). The Second Circuit in *Monroe Sander Corp. v. Livingston*, 377 F.2d 6 (2nd Cir.), *cert. denied*, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967), apparently recognized that a parent might be subject to its subsidiary's obligation under circumstances different from those here, but that decision drew a sharp dissent on the ground that the issue was not properly in the case, relied on assumptions that *Howard Johnson* subsequently overturned, and has not been followed in the more recent decisions of district courts in that circuit. *See Tishman Corp. v. Elevator Constructors*, 92 L.R.R.M. 2705 (S.D.N.Y.1976); *Hiram Walker—W. A. Taylor Distributors, Inc. v. Liquor Salesmen's Union, Local 2*, 77 Lab.Cas. ¶ 11,110 (S.D.N.Y.1975). *See also United Telegraph Workers v. NLRB*, 187 U.S.App.D.C. 231, 571 F.2d 665 (D.C.Cir. 1978). And as the district court found, the rules applied in other contexts for determining when to ignore separate corporate identities indicate that the separation should be honored here. 439 F.Supp. at 617–21; *see Interocean Shipping Co. v. National Shipping and Trading Corp.*, 523 F.2d 527 (2d Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976). Especially in light of the Supreme Court's admonition that "[i]n our development of the federal common law under § 301, we must necessarily proceed cautiously, in the traditional case-by-case approach of the common law," *Howard Johnson, supra*, 417 U.S. at 256, 94 S.Ct. at 2240, disregard of this precedent in favor of a novel rule of imputed liability for arbitration agreements would be inappropriate here.

*Affirmed.*