706 F.2d 18
 113 L.R.R.M. (BNA) 2219, 97 Lab.Cas. P 10,121
 PENNTECH PAPERS, INC., T.P. Property Corporation, and
Kennebec River Pulp and Paper Company, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
United Paperworkers International Union, et al., Intervenors.
 No. 82-1635.
 United States Court of Appeals,
First Circuit.
 Argued March 9, 1983.
Decided April 26, 1983.
 
 John W. Ohlweiler, New York City, with whom Terri M. Solomon, Gary I. Horowitz, Simpson Thacher & Bartlett, New York City, Sidney St. F. Thaxter, II, and Thaxter Lipez Stevens Broder & Micoleau, Portland, Maine, were on brief, for petitioners.
 David S. Fishback, Atty., N.L.R.B., Washington, D.C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Andrew F. Tranovich, Atty., N.L.R.B., Washington, D.C., were on brief, for respondent.
 Benjamin Wyle, New York City, for intervenors.
 Before CAMPBELL and BOWNES, Circuit Judges, and MALETZ,* Senior Judge.
 MALETZ, Senior Judge.
 
 
 1
 Penntech Papers, Inc. (Penntech) and its two subsidiary companies, T.P. Property Corporation (T.P.) and Kennebec River Pulp and Paper Company (Kennebec), petition this court to review and set aside an order of the National Labor Relations Board (the Board) which found that they had failed to bargain in good faith over the effects of a decision to close Kennebec. The Board cross-applies for enforcement of its order. Incident to the alleged failure to bargain is the Board's determination that Penntech, T.P. and Kennebec are a single employer within the meaning of section 2(2) of the National Labor Relations Act (the Act) 29 U.S.C. Sec. 152(2) (1976). In resolving this latter question the court must examine what effect United Paperworkers International Union v. Penntech Papers, Inc., 439 F.Supp. 610 (D.Me.1977), aff'd sub nom. United Paperworkers International Union v. T.P. Property Corp., 583 F.2d 33 (1st Cir.1978), has on the single employer determination.
 
 
 2
 For the reasons that follow, the petition for review is denied and enforcement of the Board's order is granted.
 
 
 3
 * Background
 
 
 4
 Penntech is a Delaware corporation having its corporate offices in New York City and operating a paper mill in Johnsonburg, Pennsylvania. From 1975 to 1977 Penntech had five directors, including John Leslie and Merrill J. "Jack" Dodge, who were also Penntech's president and vice president for marketing, respectively. The other officers of Penntech included William B. Ford, vice president for finance and secretary; Stephen D. Weinroth, vice president for corporate development; Steven D. Bittel, controller; and Georgie A. Penrose, treasurer.
 
 
 5
 In May 1975, T.P. was organized and incorporated by Penntech as a wholly-owned subsidiary for the purpose of acquiring certain real estate in Johnsonburg, an acquisition which was never consummated. T.P. performed no other corporate functions until March 1976 when it purchased the outstanding capital stock of Kennebec. The directors of T.P. were Leslie, Ford, and Weinroth. These three individuals also served as T.P.'s president, vice president, and vice president/secretary, respectively. Penntech's treasurer, Penrose, also served as T.P.'s treasurer. T.P. shared corporate headquarters with Penntech, but had no separate space at the headquarters, no furniture, and no employees of its own.
 
 
 6
 Kennebec is a Maine corporation which in 1959 acquired a paper mill in Madison, Maine as its only operating facility. Following years of declining profits, Kennebec discontinued its operations on December 20, 1975, laid off its employees, and closed its mill. Approximately three months later, on March 3, 1976, T.P. purchased all Kennebec's stock. As a condition precedent to the stock purchase, Penntech required Kennebec to negotiate certain changes in the collective bargaining agreement between Kennebec and the unions representing the mill employees. An amended collective bargaining agreement was signed by Kennebec and the unions on March 1, 1976.
 
 
 7
 With T.P.'s stock acquisition several of Penntech's officers and directors were appointed to serve concurrently as Kennebec officers and directors. Thus, Leslie and Ford were named as two of Kennebec's three new directors. (As of February 1977 Kennebec's board of directors consisted solely of Leslie and Ford.) Kennebec's new officers included Allen J. Nadeau, a Penntech vice president, as president;[1] Ford as vice president, secretary and treasurer; and Bittel as corporate controller. Weinroth was later added as a Kennebec vice president.
 
 
 8
 Kennebec resumed operations under its new ownership and management within a few weeks after T.P.'s stock purchase. Unfortunately, the Kennebec mill continued to be unprofitable, losing some $3,000,000 in 1976. Given this situation on November 19, 1976 Leslie called a meeting at the Kennebec mill attended by union representatives and Kennebec's department heads. At that meeting Leslie announced that unless production increased to specified levels the mill could not remain viable, adding that he would not allow Kennebec to pull Penntech down with it. With this announcement Leslie terminated the meeting. The union representatives were not given an opportunity to respond. Production did increase for a short time, but thereafter slipped into steady decline.
 
 
 9
 In January and February 1977, Kennebec lost approximately $750,000. By this time it had become obvious to at least one highly-placed company official, William B. Ford, Penntech's vice president for finance and a Kennebec director, that there would be large losses in March 1977 as well. In January and February Ford was further convinced that production would never reach the required level and communicated these views "to everyone in management in both companies." After an operations report in February 1977, Ford concluded that "a number of the steps we had taken were not being successful" and that Kennebec would not operate profitably in the future.
 
 
 10
 On March 29, 1977 the Kennebec mill was closed. Until that date the companies never notified the unions that the Kennebec mill would discontinue operations. On that day Kennebec's president, Bruce St. Ledger, having been directed by Leslie to close the mill, held a meeting with the union representatives at approximately 1:30 p.m. informing them for the first time that the mill would be shut down and that the employees should empty their lockers and remove their tools from the mill by 3:00 p.m. that same day. A letter was sent on March 30, 1977 formally advising the unions of the mill shutdown.
 
 
 11
 Five days later, on April 4, St. Ledger, who had consulted with Leslie and Penntech's attorneys on whether to label the layoff "indefinite" or "permanent," informed the union representatives that the layoff would be "indefinite." He advised them that there was a possibility that Kennebec would resume operations and that therefore the employees would not be entitled to severance pay. He was unable to provide definitive answers to the union representatives' questions concerning insurance and pension payments, and told the union representatives that if they wanted authoritative answers they should speak to Penntech's attorneys. He then gave them counsels' name and telephone number in New York City.
 
 
 12
 On April 11, 1977 the unions filed an unfair labor practice charge with the Board alleging that Kennebec had violated section 8(a)(5) and (1) of the Act, 29 U.S.C. Sec. 158(a)(5) and (1), by "terminating its operations without adequate notice or collective bargaining with the employees' representatives over the effect of the termination upon the employees." The unions also requested arbitration of a grievance relating to the employees' entitlement to vacations, pensions, and severance pay under the collective bargaining agreement. This request led to litigation by the unions seeking to compel Penntech and T.P. to arbitrate the alleged contract violations. On appeal from a dismissal of the unions' action this court held that since Penntech and T.P. were not signatories to the collective bargaining agreement, they could not be compelled to arbitrate. United Paperworkers International Union v. T.P. Property Corp., 583 F.2d at 35-6.
 
 
 13
 St. Ledger and the union representatives met for the last time on April 22, 1977. At this meeting St. Ledger stated that he was now speaking for Penntech which gave him his orders. He answered some of the unions' questions concerning vacations, insurance and pensions. However, he adhered to his earlier position that the mill employees were laid off indefinitely and not terminated permanently. In response to union inquiries as to whether Kennebec was closed permanently, St. Ledger stated that Penntech was in touch with "people in the hope to start up the mill." There were no further meetings between Kennebec and the unions. Following foreclosure Kennebec never reopened the mill.
 
 
 14
 On January 23, 1979, the Board's Regional Director issued a consolidated complaint charging that Penntech, T.P. and Kennebec (the companies), as a single employer, violated section 8(a)(5) and (1) of the Act by failing and refusing to bargain in good faith with the unions regarding the effects of the companies' decision to close the Kennebec mill.
 
 
 15
 The case was tried before an administrative law judge (ALJ) at a seven-day hearing. On January 21, 1981, the ALJ issued his decision and remedial order finding the companies to be a single employer and guilty of refusing to bargain in good faith with the unions over the effects of the mill closing. On August 9, 1982, a three member panel of the Board affirmed the ALJ's findings, conclusions and order, with some minor modifications. 263 N.L.R.B. No. 33. This petition for review and cross-application for enforcement followed.
 
 II
 Standard of Review
 
 16
 The court must enforce the Board's order if the Board correctly applied the law and if the Board's findings of fact are supported by substantial evidence on the record viewed as a whole. NLRB v. Cable Vision, Inc., 660 F.2d 1, 3 (1st Cir.1981); Soule Glass & Glazing Co. v. NLRB, 652 F.2d 1055, 1073 (1st Cir.1981); 29 U.S.C. Sec. 160(e) (1976). As interpreted by the Supreme Court in Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), " '[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Id. at 477, 71 S.Ct. at 459. In searching the entire record for substantial evidence, a reviewing court "must take into account whatever in the record fairly detracts" from the Board's fact finding as well as evidence that supports it. Id. at 487-88, 71 S.Ct. at 463-65. The court may not substitute its judgment for that of the Board when the choice is "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo," and must defer to the Board's inferences in the Board's areas of specialized experience and expertise. Id. at 488, 71 S.Ct. at 464. However, it is appropriate to set aside the Board's decision when the court "cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Id. at 488, 71 S.Ct. at 464. As to whether a party has bargained in good faith--a mixed question of law and fact--the court must sustain the Board's conclusions if reasonable. See, e.g., Famet, Inc. v. NLRB, 490 F.2d 293, 295 (9th Cir.1973); NLRB v. Marcus Trucking Co., 286 F.2d 583, 592 (2d Cir.1961).
 
 
 17
 Before turning to a review of the Board's findings of fact and conclusions of law, the court addresses the companies' contention that the Board was collaterally estopped from finding a single employer relationship in light of United Paperworkers International Union v. Penntech Papers, Inc., 439 F.Supp. 610 (D.Me.1977), aff'd sub nom. United Paperworkers International Union v. T.P. Property Corp., 583 F.2d 33 (1978).
 
 III
 Collateral Estoppel
 
 18
 In Penntech Papers, the unions brought an action, pursuant to section 301 of the Labor Management Relations Act, 29 U.S.C. Sec. 185 (1976),[2] to compel Penntech and T.P. to arbitrate certain grievances arising out of alleged violations of the collective bargaining agreement between Kennebec and the unions. The basic issue was whether Penntech, as a nonsignatory to that agreement, could be compelled to arbitrate.
 
 
 19
 While noting the extremely close relationship of the companies, the district court nevertheless concluded that under an alter ego analysis Kennebec was not Penntech's alter ego, there being no showing of any illegal motive or intent to avoid Kennebec's contractual obligations to the unions. Accordingly, the fact that Penntech was the parent of Kennebec, standing alone, was insufficient to bind the former to the latter's obligation to arbitrate with the unions. Id., 439 F.Supp. at 621.
 
 
 20
 In affirming the district court, this court concluded that even though Penntech controlled Kennebec's stock and participated in its management, this, without more, was insufficient to bind Penntech, a nonsignatory, to the terms of Kennebec's collective bargaining agreement. T.P. Property Corp., 583 F.2d at 36.
 
 
 21
 The companies argue that under the doctrine of collateral estoppel this court's determination in T.P. Property Corp. precludes the Board from finding that the three companies are a single employer. It is true that courts have invoked collateral estoppel to preclude the Board from resolving an issue in a manner which is antithetical to a prior resolution of the identical issue by a district court. See, e.g., NLRB v. Heyman, 541 F.2d 796 (9th Cir.1976). But before collateral estoppel may be successfully raised there must be at a minimum an identity of issues in the two actions. Cromwell v. County of Sac, 94 U.S. 351, 353, 24 L.Ed. 195 (1876); International Wire v. Local 38, International Brotherhood of Electrical Workers, 475 F.2d 1078 (6th Cir.), cert. denied, 414 U.S. 867, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). If the issue which was adjudicated in the earlier proceeding differs significantly from the issue presented in the later proceeding, collateral estoppel is not applicable. Metropolitan District Council v. J.E. Hoetger & Co., 672 F.2d 580, 583 (6th Cir.1982).
 
 
 22
 Here, the issue presented in the section 301 action is significantly different from the issue presented in the section 8(a)(5) proceeding. In the section 301 action the basic question presented was whether Penntech was the alter ego of Kennebec. In the section 8(a)(5) proceeding the question was whether the companies constituted a single employer. The Board's decisions have made it clear that these two questions are conceptually distinct. See, e.g., Hageman Underground Construction, 253 N.L.R.B. 60, 60 n. 2 (1980); Naccarato Construction Co., 233 N.L.R.B. 1394, 1398-99 (1977). The focus of the alter ego doctrine, unlike that of the single employer doctrine, is on the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets. Carpenters Local 1846 v. Pratt-Farnsworth, Inc., 690 F.2d 489, 508 (5th Cir.1982). Unlawful motive or intent are critical inquiries in an alter ego analysis, inquiries which are wholly absent in a single employer analysis. NLRB v. Tricor Products, Inc., 636 F.2d 266, 270 (10th Cir.1980) (motivation by anti-union animus a relevant factor in alter ego analysis). See also Note, Bargaining Obligations After Corporate Transformations, 54 N.Y.U.L.Rev. 624, 638 (1979) ("while a single employer examination is essentially objective, the employer's motivation for the business change is an important element of the alter ego analysis.") It is the alter ego finding which will bind a nonsignatory to a collective bargaining agreement, not a finding of single employer status. Naccarato Construction Co., 233 N.L.R.B. at 1398-99. See Local 59, International Brotherhood of Electrical Workers v. Namco Electric, Inc., 653 F.2d 143, 147 (5th Cir.1981); UAW v. Cardwell Mfg. Co., 416 F.Supp. 1267, 1283 (D.Kan.1976); Plumbers Local 519 v. Service Plumbing Co., Inc., 401 F.Supp. 1008, 1013 (S.D.Fla.1975). See also Pratt-Farnsworth, Inc., 690 F.2d at 510 & n. 10 (alter ego analysis is appropriate in section 301 actions).[3]
 
 
 23
 In sum, "[w]hether two firms are a single employer for collective bargaining purposes and whether a single contract is binding on two separate corporations are not only different questions, but they may have different answers." Namco Electric, Inc., 653 F.2d at 147. Given the difference in legal issues presented in the section 301 action from those in the section 8(a)(5) unfair labor practice proceeding, collateral estoppel is not applicable.
 
 
 24
 Having thus concluded, we now turn to a consideration of the Board's single employer determination.
 
 IV
 Single Employer Status
 
 25
 The Board's finding of an unfair labor practice by the companies is premised on its conclusion that Penntech, T.P. and Kennebec constitute a single employer within the meaning of section 2(2) of the Act, 29 U.S.C. Sec. 152(2).[4] The Board's conclusion that nominally separate corporations constitute a "single employer" is essentially a factual one and "not to be disturbed provided substantial evidence in the record supports the Board's findings." NLRB v. Pizza Pizzaz, Inc., 646 F.2d 706, 708 (1st Cir.1981); NLRB v. C.K. Smith & Co., 569 F.2d 162, 164 (1st Cir.1977), cert. denied, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978). To determine whether two or more business entities comprise a single employer, this court has applied the four factors set out in Radio & Television Broadcast Union v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965) (per curiam): (1) interrelation of operations, (2) common management, (3) centralized control of labor relations and (4) common ownership. Soule Glass & Glazing Co. v. NLRB, 652 F.2d 1055, 1075 (1981). No one of these factors is controlling, nor need all of them be present. Single employer status ultimately depends on "all the circumstances of the case" and is marked by an absence of an "arm's length relationship found among unintegrated companies." Local 627, International Union of Operating Engineers v. NLRB, 518 F.2d 1040, 1045-46 (D.C.Cir.1975), aff'd on this issue sub nom. South Prairie Construction Co. v. Local 627, International Union of Operating Engineers, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976). Accord Soule Glass & Glazing Co. v. NLRB, 652 F.2d at 1075; NLRB v. Don Burgess Constr. Corp., 596 F.2d 378, 384 (9th Cir.), cert. denied, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979). Stated otherwise, the fundamental inquiry is whether there exists overall control of critical matters at the policy level. Soule Glass & Glazing Co., 652 F.2d at 1075; Sakrete of Northern California, Inc. v. NLRB, 332 F.2d 902, 907 (9th Cir.1964), cert. denied, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965).
 
 
 26
 Against this background, we now consider whether the Board's finding of single employer status is supported by substantial evidence.
 
 A. Interrelation of Operations
 
 27
 The record unmistakably reflects an interrelation of operations. All of Kennebec's production was purchased by Penntech and in turn sold by Penntech to the public as a Penntech product. Penntech did all of Kennebec's purchasing of materials and supplies. Although Penntech and Kennebec maintained separate payrolls and bank accounts, and filed separate tax returns, Penntech's computers were used to process Kennebec's payroll and employee wage statements. Penntech controlled all of Kennebec's sales, customer relations, credit and billing. These arrangements show a substantial qualitative degree of interrelation of operations. Cf. Los Angeles Marine Hardware Co. v. NLRB, 602 F.2d 1302, 1305 (9th Cir.1979) (same customers; central preparation of payroll).
 
 B. Common Management
 
 28
 The record also reflects substantial evidence of common management. As previously indicated, several of the same individuals were the officers and directors of all three corporations. Moreover, there is ample evidence to show that John Leslie, a director of Kennebec, as well as a director and the president of both Penntech and T.P., exercised ultimate authority over Kennebec's operations. He spent over 50% of his time at Kennebec between December 1976 and the shutdown in March 1977. Experimentation with the paper making process at Kennebec was controlled by Leslie and it was Leslie who told Kennebec employees in November 1976 that production at the mill had to be increased. In short, Leslie exercised substantial control over the operations at Kennebec.
 
 
 29
 In addition to Leslie's significant role in the management of Kennebec, Jack Dodge, vice president of marketing for Penntech, was in control of the marketing aspects of the Kennebec mill as well. Louis Wolfe, who was in charge of scheduling production at the Kennebec mill, was stationed at the Penntech plant in Johnsonburg. He reported to Jim Nesselrode, a Penntech manager, who in turn reported to Jack Dodge. The production schedules were sent daily from Wolfe to personnel at Kennebec who would then see to it that the proper paper was produced.
 
 
 30
 Thus, top-level management at Penntech was in actual control of the production processes, sales, marketing, accounting, and scheduling of production at Kennebec.
 
 C. Centralized Control of Labor Relations
 
 31
 There is also substantial evidence on the record that control of labor relations resided with Penntech. Although Kennebec's day-to-day labor matters were apparently handled at the local level, this fact is not dispositive. " 'A more critical test is whether the controlling company possessed the present and apparent means to exercise its clout in matters of labor negotiations by its divisions or subsidiaries.' " Soule Glass & Glazing Co., 652 F.2d at 1075, quoting Royal Typewriter Co. v. NLRB, 533 F.2d 1030, 1043 (8th Cir.1976). In addition to the fact that Penntech orchestrated changes in the collective bargaining agreement prior to its acquisition of Kennebec's stock, St. Ledger's conduct between the March 29, 1977 announcement of the mill shutdown and the first meeting with the union representatives on April 4, 1977, confirms that it was Penntech which exercised actual control over the more significant labor relations matters. During that time St. Ledger had conferred with Leslie as to how the employee layoff should be classified and was instructed to contact Penntech's attorneys. Moreover, St. Ledger at one point directed the union representatives to contact Penntech's attorneys for answers to their questions regarding the employees' insurance and pensions. From a review of the entire record we find substantial support for a finding that Penntech both possessed and exercised control over critical matters at the policy level, including "the present and apparent means to exercise its clout" in labor relations matters. Soule Glass & Glazing Co., 652 F.2d at 1075.
 
 D. Common Ownership
 
 32
 The record further reflects common ownership. Penntech owned 100% of the stock in T.P., and T.P. was a 100% stockholder of Kennebec. Cf. NLRB v. Borg Warner Corp., 663 F.2d 666, 668 (6th Cir.1981), cert. denied, --- U.S. ----, 102 S.Ct. 2903, 73 L.Ed.2d 1313 (1982).
 
 
 33
 In sum, there is substantial evidence in the record considered as a whole supporting the Board's finding that Penntech and its wholly-owned subsidiaries, T.P. and Kennebec, constitute a single employer within the meaning of section 2(2) of the Act. Soule Glass & Glazing Co., 652 F.2d at 1076; NLRB v. Big Bear Supermarkets No. 3, 640 F.2d 924, 930 (9th Cir.), cert. denied, 449 U.S. 919, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980); NLRB v. Master Slack, 618 F.2d 6, 7, 8 (6th Cir.1980).
 
 V
 The Section 8(a)(5) and (1) Violation
 
 34
 This brings us to the unfair labor practice found by the Board. Initially, we note that an employer has a duty to bargain with a union over the effects of its decision to close one of its plants. First National Maintenance Corp. v. NLRB, 452 U.S. 666, 681-82, 101 S.Ct. 2573, 2581-82, 69 L.Ed.2d 318 (1981); Electrical Products Div. of Midland-Ross Corp. v. NLRB, 617 F.2d 977, 983 (3d Cir.), cert. denied, 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980); Morrison Cafeterias Consolidated, Inc. v. NLRB, 431 F.2d 254, 257 (8th Cir.1970). Here, the Board concluded that the companies violated section 8(a)(5) and (1) of the Act by failing to bargain in good faith with the unions over the effects on the Kennebec employees of the decision to close the Kennebec mill. The court finds that there is substantial evidence to support this conclusion.
 
 
 35
 In order to meet its obligation to bargain over the effects on employees of a decision to close, an employer must conduct bargaining "in a meaningful manner and at a meaningful time." First National Maintenance Corp., 452 U.S. at 682, 101 S.Ct. at 2582. A concomitant element of "meaningful" bargaining is timely notice to the union of the decision to close, so that good faith bargaining does not become futile or impossible. NLRB v. National Car Rental System, Inc., 672 F.2d 1182, 1189 (3d Cir.1982); NLRB v. Royal Plating & Polishing Co., 350 F.2d 191 (3d Cir.1965). The determination of whether an employer has provided such meaningful and timely notice is essentially one of fact, and the Board's findings in this regard are to be accepted if supported by substantial evidence. National Car Rental System, Inc., 672 F.2d at 1189-90.
 
 
 36
 On the question of notice, it is clear that the notice to the unions on March 29, 1977 of the decision to terminate Kennebec's operations that very same day did not afford the unions an adequate opportunity to bargain over the effects of that decision upon the employees. The record supports the ALJ's finding that there was no emergency situation which would explain or justify such precipitous action. Furthermore, the companies' testimony to the effect that the decision to close was made on the actual day of the closing--March 29, 1977--was not credited by the ALJ. From the record a fair inference can be drawn that the decision to close was made in advance of that date. First, T.P. had sent Kennebec a demand letter on March 17, 1977 regarding past due promissory notes in order to protect its lien interest in Kennebec upon closure. Second, production had been poor in January and February 1977, indicating to at least some in top management that the Kennebec mill was on the brink of collapse. Third, equipment was removed from the mill on March 30, 1977, the day after the unions were notified of the closure, indicating advance preparation for the closure. Finally, St. Ledger admitted that he had broached the subject of closure with Penntech's management as far back as November 1976 and again three to four days before the actual shutdown. These facts all point to a decision to close made prior to March 29, 1977.
 
 
 37
 The companies argue that the unions were put on notice of a possible shutdown in November 1976 when Leslie informed the union representatives of the need for increased production, making an oblique reference to a possible closure in the absence of such an increase. However, a vague remark cannot pass for "reasonable notice" of a shutdown as mandated by the Act. NLRB v. Transmarine Navigation Corp., 380 F.2d 933, 940 (9th Cir.1977). Even assuming that the unions had sufficient information to suspect that closure was imminent, it did not place an obligation on them to request effects bargaining, since "suspicion or conjecture cannot take the place of notice where notice is required." ILGWU v. NLRB, 463 F.2d 907, 918 (D.C.Cir.1972).
 
 
 38
 Finally, the record is replete with evidence of the companies' failure to bargain in good faith over the effects of closure after the March 29, 1977 announcement to shut down had been made. First, the companies failed to bargain in good faith to the extent that no responsible official from any of the companies was present at the April 4 meeting. St. Ledger disclosed his limited authority when he referred the union representatives to Penntech's attorneys for answers to their questions. His bargaining authority was insufficient to satisfy the requirements of good faith bargaining. Cf. NLRB v. Maywood Do-Nut Co., Inc., 659 F.2d 108 (9th Cir.1981); Pepper & Tanner, Inc., 197 N.L.R.B. 109 (1972), enforced on this issue, 474 F.2d 1256 (6th Cir.1973). Of even greater significance is that even though equipment had been removed from the mill and Penntech had cut off the flow of funds to Kennebec, and even though Kennebec's industrial relations manager had written to the unions that a resumption of operations by Penntech or any other company was unforeseeable, St. Ledger still advised the unions that Kennebec had not permanently ceased operation and that the employees, therefore, would be on "indefinite" layoff. Not only was this representation disingenuous but, as the Board correctly found, it also constituted bad faith bargaining. United Steelworkers v. NLRB, 390 F.2d 846, 852 (D.C.Cir.1967), cert. denied sub nom. Roanoke Iron & Bridge Works, Inc. v. NLRB, 391 U.S. 904, 88 S.Ct. 1654, 20 L.Ed.2d 419 (1968).VI
 
 Conclusion
 
 39
 The record considered as a whole supports the findings of fact made by the Board and shows that they are supported by substantial evidence. NLRB v. Enterprise Ass'n, Local 638, 429 U.S. 507, 531, 97 S.Ct. 891, 905, 51 L.Ed.2d 1 (1977); NLRB v. Gray-Grimes Tool Co., Inc., 557 F.2d 1233, 1234 (6th Cir.1977), cert. denied, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978). For this and all the foregoing reasons, the petition for review is denied and the order of the Board is enforced.
 
 
 
 *
 Of the United States Court of International Trade, sitting by designation
 
 
 [1]
 Bruce St. Ledger eventually replaced Nadeau as Kennebec's president
 
 
 [2]
 That section provides in part:
 Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
 
 
 [3]
 We find additional support for our conclusion that the issues raised in a section 301 action to compel arbitration differ from those raised in unfair labor practice proceedings in the Supreme Court's decision in NLRB v. Burns Security Services, Inc., 406 U.S. 272, 273, 92 S.Ct. 1571, 1575, 32 L.Ed.2d 61 (1972). In Burns, the Court held that a "successor" employer which hired a majority of the employees in a bargaining unit represented by a recently certified bargaining agent was obligated to bargain with the agent over the terms and conditions of employment. 406 U.S. at 281, 92 S.Ct. at 1579. The Court expressly refused, however, to impose on the successor the duty to honor the specific contractual obligations embodied in the previous employer's collective bargaining agreement with the employees' representative. 406 U.S. at 291, 92 S.Ct. at 1584. In discussing this issue the Court distinguished between the statutory obligation to bargain with the union under section 8(d) of the Act and the contractual obligations normally enforced through an action to compel arbitration under section 301, emphasizing that the latter obligations arose as a result of the mutual agreement of the parties. 406 U.S. at 286, 92 S.Ct. at 1581
 
 
 [4]
 That section provides in part:
 When used in this subchapter--
 * * *
 (2) the term "employer" includes any person acting as an agent of an employer, directly or indirectly, ...